MILTON E. DAVIS v. PENELOPE D. DAVIS

No. 8029DC1169

(Filed 1 September 1981)

**Divorce and Alimony § 26.1— Uniform Child Custody Jurisdiction Act—findings required by court**

  Where a child custody action is already pending in another state, the trial court must answer the threshold question of whether the other state was exercising jurisdiction substantially in conformity with the Uniform Child Custody Jurisdiction Act. The record did not show that California obtained jurisdiction over this child custody proceeding substantially in conformity with the Act where the record showed that N.C. rather than California was the home state of the children; there was no evidence that the children had a "significant connection" with California or that there was available in California "substantial evidence" concerning the children's care; and there was significant evidence that defendant had on several occasions taken the children from N.C. to California without plaintiff's consent. G.S. 50A-6(a); G.S. 50A-8(a).

APPEAL by plaintiff from *Gash, Judge.* Order filed 17 July 1980 in District Court, RUTHERFORD County. Heard in the Court of Appeals 26 May 1981.

In this child custody appeal, we determine purusant to North Carolina's Uniform Child Custody Jurisdiction Act, G.S. 50A-1, *et seq.,* whether North Carolina or California obtained jurisdiction in this child custody action.

FACTS AS ALLEGED IN THE COMPLAINT

In 1973, while the plaintiff, Milton E. Davis, and his family were living in North Carolina, the defendant, Penelope D. Davis, abandoned Mr. Davis and took the three children of the marriage to Texas with her. After finding out where his wife had gone, Mr. Davis flew to Texas and regained custody of the children with whom he returned to North Carolina. Mrs. Davis then went to California, but, within thirty days, called Mr. Davis and "begged him to let her come back. . . ." The parties reconciled, and in February 1974, a fourth child was born of the marriage. In December 1976, Mrs. Davis again left Mr. Davis, but she returned after several weeks. At that time she and Mr. Davis entered into a separation agreement by the terms of which Mr. Davis received custody of the four children.

Davis v. Davis

Thereafter Mrs. Davis lived with another man in South Carolina for almost a year and then persuaded Mr. Davis to let her come back. After this third reconciliation, the parties in March 1978 borrowed money against their income tax refunds so that Mrs. Davis might fly to California to visit her mother. When Mrs. Davis returned from California, she took the income tax refund checks and cashed them, thereby causing Mr. Davis not only to lose his refund but also the have to pay back the money they had borrowed against the refund checks. Mrs. Davis then left home again, taking the children with her. In January 1979, she telephoned Mr. Davis and informed him that, if he would send plane tickets, she would send the children back. Mr. Davis sent the tickets and the children came back to North Carolina in January. A little over a month later, Mrs. Davis returned, and Mr. Davis agreed to let her stay. After three days, and while Mr. Davis was at work, Mrs. Davis took the children without Mr. Davis' knowledge and flew to California.

In June 1979, Mrs. Davis again telephoned Mr. Davis from California and informed him that her mother was forcing the children and her to move out of the mother's home and that, if Mr. Davis would send plane tickets for the children, she would send them back home to North Carolina. Mr. Davis again sent tickets, and the children returned to North Carolina.

PROCEDURAL HISTORY

In August 1979, while the four children were living with Mr. Davis, Mr. Davis filed a Complaint in the Rutherford County District Court (trial court), seeking permanent and exclusive custody of the four children born during the parties' twelve-year marriage.

Mrs. Davis, on 5 October 1979, filed an Answer to the Complaint denying allegations concerning abandonment and her treatment of the children. She affirmatively alleged that, purusant to an order entered in a Kings County, California Superior Court case, wherein she was the petitioner, she was granted custody of the four children pending further hearing in the California action; that Mr. Davis had the children in the summer of 1979 only because she granted him visitation privilege; that Mr. Davis refused to return them to California as agreed; that on 5 September 1979, a further Order was entered by the California

court reaffirming that Penelope Davis had custody of the children; that Mr. Davis had notice of, but failed to appear in, the California proceedings; and that Mr. Davis did not file this custody action in the trial court until he was served with notice of a separate action instituted in California, pursuant to the Uniform Reciprocal Enforcement of Support Statute requiring him to reimburse the State of California for public assistance provided by California to the children.

At the July 1980 custody hearing in Rutherford County, the trial court restricted the evidence to that which tended to show whether it had jurisdiction over the case. After hearing the evidence, the trial court telephoned a superior court judge of Kings County, California, who indicated that the California court would not relinquish its jurisdiction over the matter. On the basis of that telephone conversation and the provisions of Chapter 50A of the North Carolina General Statutes, the trial court determined that it did not have jurisdiction to determine the custody of the four children, except to enforce the decree of the California court, and that it did not have jurisdiction to modify the custody order of the California court. Plaintiff appealed.

*Jones & Jones, by B. T. Jones, for plaintiff appellant.*

*J. H. Burwell, Jr., for defendant appellee.*

BECTON, Judge.

We do not reach appellant's five assignments of error relating to evidentiary matters since appellant's sixth assignment of error, relating to the entry and signing of the order appealed from, raises, albeit barely, the dispositive jurisdictional question. Appellant's sixth assignment of error presents for review the questions of whether the trial court's conclusions of law—that it did not have jurisdiction to determine the custody issue or to modify the California custody order—are supported by the findings of fact and whether any other alleged error of law appears upon the face of the record. *See Swygert v. Swygert,* 46 N.C. App. 173, 264 S.E. 2d 902 (1980).

In determining the jurisdiction question, we must interpret portions of North Carolina's Uniform Child Custody Jurisdiction Act, G.S. 50A-1, *et seq.* (Uniform Act). Since the Uniform Act

represents an effort to control sensitive and potentially volatile child custody contests, and since the issue raised in this case has not been definitively addressed by our courts, we feel a grave responsibility to interpret thoroughly the Uniform Act so as to accomplish its purposes. On the facts of this case, and for the reasons set forth below, the trial court erred in concluding that the California court had jurisdiction over this child custody matter.[1]

I

The Uniform Child Custody Jurisdiction Act was approved in 1968 by the National Conference of Commissioners on Uniform State Laws. In 1979, North Carolina enacted its Uniform Act, which is substantially similar to that proposed by the Commissioners, and it became effective in July of that year. By its enactment, North Carolina joined the majority of states adopting measures to solve the problems of child custody within an increasingly mobile society, the problems of child-snatching by the noncustodial parent, and the problems of forum shopping.[2] The Com-

---

1. *Compare Nabors v. Farrell,* 53 N.C. App. --- , --- S.E. 2d --- (filed 4 August 1981).

2. The specific purposes of the Uniform Act are set forth in G.S. 50A-1(a). They are to:

(1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;

(2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;

(3) Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and the child's family have the closest connection and where significant evidence concerning the child's care, protection, training and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and the child's family have a closer connection with another state;

(4) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

(5) Deter abductions and other unilateral removals of children undertaken to obtain custody awards;

missioners' Prefatory Note to the Uniform Act contains this description of the effects of shifting custody:

> The harm done to children by these experiences can hardly be overestimated. It does not require an expert in the behavioral sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection. A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society.

9 Uniform Laws Ann. 112 (1979).

Whenever one of our district courts holds a custody proceeding[3] in which one contestant[4] or the children appear to reside in another state, the court must initially determine whether it has jurisdiction over the action. Under the provisions of the Uniform Act, specifically, G.S. 50A-3(a), a North Carolina district court would have jurisdiction to make an initial custody determination or to modify an existing decree if:

> (1) This State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this State

---

(6) Avoid re-litigation of custody decisions of other states in this State insofar as feasible;

(7) Facilitate the enforcement of custody decrees of other states;

(8) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerned with the same child; and

(9) Make uniform the law of those states which enact it.

The remainder of the Uniform Act is to be construed so as to promote these general purposes. G.S. 50A-1(b).

3. "Custody proceeding" is defined by G.S. 50A-2(3) to include proceedings in which a custody determination is one of several issues, *e.g.* an action for divorce, and to include neglect and dependency proceedings.

4. "Contestant" is defined as a person, including a parent, who claims custody of, or visitation privileges with, a child. G.S. 50A-2(1).

because of the child's removal or retention by a person claiming the child's custody or for other reasons, and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and the child's parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence relevant to the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

Physical presence of the child is not a jurisdictional prerequisite to determine custody. G.S. 50A-3(c). Indeed, paragraphs (1) and (2) of G.S. 50A-3(a) establish the two major bases for jurisdiction. The Commissioners' Note to the Uniform Act states:

In the first place, a court in the child's home state has jurisdiction, and secondly, if there is no home state or the child and his family have equal or stronger ties with another state, a court in that state has jurisdiction. If this alternative test produces concurrent jurisdiction in more than one state, the mechanisms provided in . . . [G.S. 50A-6 and 7] are used to assure that only one state makes the custody decision.

9 Uniform Laws Ann. at 123.

When there are simultaneous proceedings in another state, the provisions of G.S. 50A-6 must be complied with. G.S. 50A-6 requires a North Carolina court to stay its child custody pro-

ceedings only if it determines (1) that the out-of-state court is "exercising jurisdiction substantially in conformity with" the Uniform Act, G.S. 50A-6(a), and (2) that "the court in which the other proceeding is pending . . . is the more appropriate forum." G.S. 50A-6(c).

A North Carolina court with jurisdiction to make an initial or modification decree may decline its jurisdiction prior to its decree if it determines that it is an inconvenient forum for the custody decision and that the court of another state is a more appropriate forum. G.S. 50A-7(a). In determining whether it is an inconvenient forum, the court shall consider if it is in the best interests of the child that another state assume jurisdiction. G.S. 50A-7(c). Some of the factors necessary for this determination are:

> (1) If another state is or recently was the child's home state;

> (2) If another state has a closer connection with the child and the child's family or with the child and one or more of the contestants;

> (3) If substantial evidence relevant to the child's present or future care, protection, training, and personal relationships is more readily available in another state;

> (4) If the parties have agreed on another forum which is no less appropriate; and

> (5) If the exercise of jurisdiction by a court of this State would contravene any of the purposes stated in G.S. 50A-1.

G.S. 50A-7(c). Before determining whether it should decline or retain jurisdiction, the trial court may communicate with a court of another state to "exchange information pertinent to the assumption of jurisdiction by either court with a view toward assuring that jurisdiction will be exercised by the more appropriate court. . . . " G.S. 50A-7(d).

Furthermore, to discourage child-snatching and forum shopping, the provisions of G.S. 50A-8 allow the court to decline jurisdiction

> (a) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar

reprehensible conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

(b) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction if this is just and proper under the circumstances.

G.S. 50A-8(a) and (b). In "appropriate cases" a court dismissing an action under these provisions may charge the petitioner necessary travel and other expenses, including attorneys' fees, incurred by the responding parties and their witnesses. G.S. 50A-8(c).

Finally, in our review of the provisions of the Uniform Act pertinent to this decision, we note that G.S. 50A-14 allows modification of custody decrees handed down in foreign jurisdictions:

(a) If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this Chapter or has declined to assume jurisdiction to modify the decree and (2) the court of this State has jurisdiction.

(b) If a court of this State is authorized under subsection (a) and G.S. 50A-8 to modify a custody decree of another state it shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with G.S. 50A-22.

There is strong bias toward allowing the state in which a decree has been entered to retain jurisdiction. The Commissioner's Note analyzed the purpose of this section:

Davis v. Davis

Courts which render a custody decree normally retain continuing jurisdiction to modify the decree under local law. Courts in other states have in the past often assumed jurisdiction to modify the out-of-state decree themselves without regard to the preexisting jurisdiction of the other state. See People ex rel, *Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947). In order to achieve greater stability of custody arrangements and avoid forum shopping, subsection (a) declares that other states will defer to the continuing jurisdiction of the court of another state as long as that state has jurisdiction under the standards of this Act. In other words, all petitions for modification are to be addressed to the prior state if that state has sufficient contact with the case to satisfy section 3 [G.S. 50A-3].

9 Uniform Laws Ann. at 154.

### III

After this review of jurisdictional considerations, we turn now to the case at bar and set forth the bases upon which we conclude that the trial court erred in concluding that California had jurisdiction over this child custody matter.

Only two of the trial court's findings of fact relate specifically to California's compliance with the Uniform Act. Finding of Fact number 22 concerns a California judge's statement that the California proceedings were "conducted in compliance with the provisions of the 'Uniform Child Custody Jurisdiction Act', which was and is a part of the laws of the State of California." Finding of Fact number 31 simply states, in conclusion-of-law fashion, that "the Courts of the State of California were exercising . . . jurisdiction substantially in conformity with Chapter 50A of the North Carolina General Statutes." These findings are not sufficient to support the trial court's conclusions of law.

In determining the jurisdictional question in a custody hearing, a trial court must go beyond the mere recitation of dates and residences. Under the provisions of the Uniform Act, our courts are compelled to consider such factors as the child's history, the child's best interests, and the conduct of the contestants.

When, as here, there is an action already pending in another state, the trial court must answer the threshold question of

whether the other state was *"exercising jurisdiction substantially in conformity with this Chapter. . . ."* G.S. 50A-6(a); *see also* G.S. 50A-14(a) and *Theresa H. v. Pasquale G.,* 102 Misc. 2d 759, 424 N.Y.S. 2d 652 (1980). The record does not show that California obtained jurisdiction over this case "substantially in conformity with" the Uniform Act. Indeed, the order signed by the trial court contained the following findings of fact:

9. That the plaintiff and the defendant and their eldest son came to North Carolina during the year 1968 and that thereafter said children resided in the State of North Carolina until the end of April or early May 1978.

10. That the plaintiff and the defendant both resided together in the State of North Carolina from 1968 until the last of April or the first of May, 1978, except for a period of separation of approximately one year occurring in 1976 and 1977, during which period of separation said children resided in the State of North Carlina with the plaintiff.

11. That the defendant removed herself and said four children to the State of California arriving there during the latter part of May, 1978, and that the defendant and said children resided in the State of California from the latter part of May, 1978, until early January, 1979.

12. That said four children were in the State of North Carolina with the plaintiff from about January 9 or 10, 1979, until the latter part of February, 1979, when they returned to California with the defendant.

13. That said children were in the State of California with the defendant from the latter part of February, 1979, until about June 8, 1979, when they returned to North Carolina.

14. That said four children remained in the State of North Carolina with the plaintiff from about June 8, 1979, until the institution of this action and that since the institution of this action, said children have remained in the State of North Carolina with the plaintiff pursuant to the Orders of this Court.

In addition to finding that Mrs. Davis removed herself and the children to California in May of 1978, the trial court further

found that Mrs. Davis in June of 1978, filed a petition seeking, *inter alia,* custody of the four children. We do not believe that, by this brief interlude (one month) in California, California obtained jurisdiction in conformity with G.S. 50A-3. There is plenary evidence in the record that North Carolina has always been the children's home even though the trial court refused to admit Mrs. Davis' testimony that North Carolina had "always been . . . [the children's] home. . . ." The Separation Agreement in which Mrs. Davis, "freely and voluntarily without fear or compulsion," agreed in 1977 that Mr. Davis was to have custody of the children is also in the record. The trial court's reliance upon the California judge's assertion that the California court had jurisdiction which it would not relinquish was error. With all due respect to the courts of other states, the trial courts in this State cannot delegate their responsibility to determine jurisdictional questions to the opinion of a foreign court.

Furthermore, the pleadings suggested that when Mrs. Davis left North Carolina in May 1978, she took the children without Mr. Davis' consent. Mrs. Davis' testimony at the hearing substantiated this:

> In the spring of 1978, I told him I wanted to go back to my mother's. I went back to see my mother. I went to California for a week and then I returned. I would say I stayed approximately a month and then I took the children. I took the children while he was at work and went back to California without his knowledge or consent. . . . I called him from Wyoming in December of '78 or January of '79. . . . Mr. Davis sent tickets for the children to Wyoming and I sent them on a plane here. . . . I learned that Mr. Davis put them in school when they came home. . . . I came back to North Carolina. I didn't tell Mr. Davis that I was coming back home. I came back to get my children. He would have never let them out of his sight if I told him I came to get them. Mr. Davis was trying to keep the children.

We read this testimony to raise the almost certain possibility that Mrs. Davis was engaged in "snatching" the children from Mr. Davis, conduct we believe to be reprehensible under the terms of G.S. 50A-8(a). We, therefore, have an additional and substantial reason to question whether the California court correctly determined that it had jurisdiction.

From the findings of fact concerning Mrs. Davis' mobility, we find the court's conclusions of law that California had jurisdiction to be erroneous. California was not, under the Uniform Act, the "home state" of the children, G.S. 50A-3(a)(1), nor was there any evidence that the children had a "significant connection" with California or that there was available in California "substantial evidence" concerning the children's care, G.S. 50A-3(a)(2). Finally, there was significant evidence provided by Mrs. Davis herself that she had, on several occasions, taken the children from North Carolina without plaintiff's consent. *See* G.S. 50A-8.

On the other hand, the evidence supported the findings of fact made by the trial court, and those findings would support the conclusions that North Carolina had exclusive jurisdiction over the custody matter. By virtue of their lives here, North Carolina was clearly the "home state" of the children.

We are not, therefore, obligated to enforce the California custody order. Under the provisions of G.S. 50A-13, we must enforce decrees only under certain circumstances. When the court of another state has entered an initial or modification decree in a child custody matter, the courts of this State must recognize and enforce that decree when the foreign court has "assumed jurisdiction under statutory provisions substantially in accordance with this Chapter or which was made under factual circumstances meeting the jurisdictional standards of this Chapter. . . ." *Id.* Since the record does not show that the California court assumed jurisdiction under the standards set forth in G.S. 50A-3, its decree is null and void. *See Hopkins v. Hopkins,* 8 N.C. App. 162, 174 S.E. 2d 103 (1970).

In reaching this conclusion, we are not unmindful of the possibility that we are setting up a jurisdictional dispute with the State of California. Pursuant to the provisions of the Uniform Child Custody Jurisdiction Act and with the facts we have before us, however, we feel compelled to reach this result.

Reversed.

Judge VAUGHN and Judge ARNOLD concur.