LEVINSON, Judge.
The present appeal arises from a district court order terminating the parental rights of Katherine and Steven Pierce as to the minor child A.R.P. Only Mr. Pierce has appealed from the order. We affirm.
Prior to 2001, A.R.P. lived with her mother (Katherine Pierce) from the time she was a toddler. With the exception of a brief trip to New York in late 2000, A.R.P. and her mother lived in Dare County, North Carolina from 1996 until January 2001. During this time, the Dare County Department of Social Services (DSS) investigated allegations of neglect of A.R.P. and/or other child protective services reports in 1996, 1997, 1999, and several timesin 2000; all of these reports were substantiated. Steven Pierce, A.R.P.'s father, has lived in New York during all of the child's life; his contact with A.R.P. has been infrequent and of limited duration.
In January 2001, DSS assumed non-secure custody of A.R.P., and in February 2002, DSS filed a petition to terminate the parental rights of Katherine and Steven Pierce. Following a hearing on the matter, the district court entered a lengthy order which contained the following unchallenged findings of fact:
6. The biological father of the minor child is Steven Pierce, Jr. who is more than 18 years of age and whose address is [in] Gloversville, New York.
. . . .
22. . . . .
R. [A.R.P.] . . . had previously been diagnosed with Autism and Post Traumatic Stress Disorder. She receives special educational services to accommodate her emotional/behavioral needs in the school setting. [A.R.P.] needs regular therapy [and] medication . . . . [A.R.P.] needs a stable home environment. . . .
35. . . . .
Z. Stephen Pierce . . . has failed throughout [the child's] life to be the father that [A.R.P.] needs and deserves.
AA. When Mr. Pierce became aware that Audrey needed placement he gave only lip service to the small efforts needed of him to ensure that she could come to stay with him. In January of 2001, Mr. Pierce contacted the Clerk of Court to get the Affidavit of Indigency that would have furnished him an attorney. He held onto the form through two hearings before sending it in November of 2001. Mr. Pierce was given his previous attorney Angela Norcross' contact information in November by Susan Davis, Assistant Clerk of Court, andagain in December of 2001 by [DSS] so that he could talk to her and be represented in Court. Mr. Pierce failed to call his Court appointed lawyer. He received notice the first part of March of 2002 that his parental rights were going to be terminated and sat on that information for several weeks before responding.
BB. Mr. Pierce stayed out of touch with [DSS] for six critical months while his child remained in foster care. More importantly he has failed to show that he cares for this child's feelings. He does not call her or provide meaningfully for her emotional needs. . . .
. . . .
EE. [In three telephone conversations with Ms. Hadeed, a social worker with DSS], Mr. Pierce did not ask . . . how his daughter was doing or how to contact her. . . .
. . . .
GG. In mid-April 2001, Ms. Hadeed attempted numerous times to reach Mr. Pierce at his residence telephone number. The number was repeatedly busy or there was no answer. Ms. Hadeed sent Mr. pierce a letter on May 2, 2001 in regards to the upcoming permanency planning hearing. Mr. Pierce did not respond to the letter at that time. He returned it the following October of 2001. Ms. Hadeed continued to try to reach Mr. Pierce by telephone.
HH. On May 31, 2001, Ms. Hadeed wrote Mr. Pierce requesting that he call her. Ms. Hadeed tried repeatedly to reach him by telephone and the line was always busy or there was no answer. Mr. Pierce had not tried to call Ms. Hadeed in two months. Mr. Pierce did not respond to this letter and Ms. Hadeed continued to try to call him without success. On July 16, 2001, Ms. Hadeed spoke [with a New York caseworker, who informed her that Mr. Pierce had moved and provided her with Mr. Pierce's new contact information]. Ms. Hadeed began calling th[e] [new] number and leaving messages for Mr. Pierce to call. He did not call back. On July 24, 2001, Ms. Hadeed wrote Mr. Pierceabout his daughter's move to therapeutic foster care in New Bern. . . . [A.R.P. had previously been at the Wright Place for Children group home in Manteo.] The staff at the Wright Place reported that Mr. Pierce had called A.R.P. twice while she was staying there in a six month time period. Mr. Pierce had not sent her any cards or presents.
II. . . . [A.R.P.'s] father did not call her, send her a card or anything for her [31 June 2001] birthday. On October 9, 2001, Mr. Pierce finally wrote the Department a letter saying that he was not being called enough about his daughter's progress. It was the response letter he had been sent back in May 2001, requesting an answer for the May Permanency Planning Team meeting, which he had been requested to return by May 18, 2001. Ms. Hadeed was finally able to contact Mr. Pierce by telephone on October 17, 2001. Mr. Pierce indicated that he was presently out of work due to back trouble. Ms. Hadeed inquired if he was really interested in having [A.R.P.] at that point, since it had been so long since she had heard from him. Mr. Pierce was somewhat hesitant, but did say he wanted her. Ms. Hadeed inquired if he was really in a position to afford another child. He again hesitated, but said he was. Mr. Pierce said his wife was running a machine in a factory and he was staying home watching their four children.
. . . .
KK. . . . Ms. Hadeed telephoned Mr. Pierce on November 8, 2001 and advised him verbally of the outcome of [a] hearing [he had not attended]. . . . Mr. Pierce was referred to the Clerk of Court to see about getting a lawyer for the next hearing. Mr. Pierce did not ask how his daughter was doing. On December 11, 2001, Ms. Hadeed telephoned Steven Pierce to discuss the status of the case. His situation remained unchanged. Ms. Hadeed advised him of [A.R.P.'s] status. He now said that he was not coming to Court in January [for a hearing]. . . . Ms. Hadeed called Mr. Pierce on December 12, 2001 and advised him that his attorney was AngeleaNorcross and gave him contact information for her. Mr Pierce did not contact Ms. Norcross.
LL. Mr. Pierce did call his daughter at the group home on December 11, 2001 and December 15, 2001, the only times he did so in the eight months that she was there. Ms. Hadeed wrote Mr. Pierce on December 19, 2001 and advised him that the Permanency Planning Team had reviewed his daughter's case, including his home study and that of the grandmother and recommended that [A.R.P.] be placed with the maternal grandmother after [A.R.P.]'s discharge from residential treatment. Mr. Pierce did not call Audrey for Christmas or send her anything. Mr. Pierce did not respond to Ms. Hadeed's December 19, 2001 letter.
. . . .
NN. The Department received correspondence from Mr. Pierce on February 9, 2001 that he wanted to be able to contact his daughter and in response, Ms. Hadeed telephoned Stephen Pierce on February 12, 2001. Ms. Hadeed indicated that she received his permanency planning committee letter. Ms. Hadeed gave him the telephone number of the Wright Place and indicated that he was free to call his daughter at any time. Ms. Hadeed indicated that the only reason she had not given it to Mr. Pierce before was that he had not asked for it.
OO. According to Carolyn Williams from Edell's Group Home ([A.R.P.]'s recent therapeutic residential placement) [A.R.P.] was in her facility from July 20, 2001 until March 18, 2002. She indicated that in her log book, Mr. Pierce had called only two times while [A.R.P.] was there . . . . Mrs. Williams indicated that Mr. Pierce did not call at Christmas or send a present. He did not send her a birthday present or call her for her birthday.
PP. Mary Bowden from the Wright Place stated that Mr. Pierce had called only two times from January 2001 until [A.R.P.] left the Wright Place in July 2001. He spoke to [A.R.P.] one time. He called another time when [A.R.P.]was out and was told when to call back, but he did not do so.
. . . .
UU. The father had not come to Dare County to visit his daughter prior to this hearing date and failed to get involved with his special needs child. The father had only called his daughter two times and he failed to pay a reasonable portion of the cost of her care. The father paid a negligible amount for her care and there was no evidence that the father could not work. The father stayed out of contact with the Department of Social Services and the Department had to hunt him down to apprize [sic] him of his daughter's status. The father did not exhibit the needed love and affection for his child. There was no evidence that the father had furnished his daughter with cards for her birthday or otherwise at either foster care placement. The father was unable to tell the Court [A.R.P.]'s diagnosis, had no knowledge of her current status and was unable to describe what services she was receiving or what her needs were. The father is capable of providing support for his child and he has the ability to perform some work. His current disposable income is greater when he is not working than when he is working. He could have provided some support for his child but he chose not to do so. He has not filed or requested to have his [c]ourt ordered support modified at any time.
36. This is the father's first appearance at any [c]ourt proceeding. The father chose not to attend any prior hearings and failed to get involved with his minor child or be involved in the [c]ourt proceedings to have his daughter returned to his care. The father's prior experience with the [c]ourts in New York shows that he knew what to do but failed to take any action in North Carolina.
. . . .
38. Mr. Pierce stated that he wanted custody of his child but his lack of action and involvement shows that he does not want the responsibility that goes with the care of a special needs child.
. . . .
40. There was no emotional testimony from the father. The father failed to say that he loves his child and he did not say that he wants what is best for his child. The father did not understand his daughter's special needs and was unable to explain her needs. The father did not know that his daughter had been handcuffed and taken to a psychiatric hospital because he did not call to talk to anyone including his child. The father does not know what training his child has received, and has not talked to [A.R.P.]'s counselor to see what his child would need in order to be successful. The Court has doubts about the stability of the father's home.
The trial court concluded that, based on the foregoing findings of fact, the parental rights of Steven Pierce should be terminated because, inter alia, he had neglected the child within the meaning of N.C.G.S. § 7B-101, and it was in the best interests of A.R.P. that his parental rights be terminated.
Mr. Pierce now appeals, contending the trial court erred by (1) concluding that there were grounds for termination of his parental rights, and (2) concluding that it had jurisdiction to enter the order and that the action was not brought to circumvent the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). For the reasons that follow, we are unpersuaded by these arguments.
This Court reviews a trial court order terminating parental rights for whether the findings of fact are supported by clear, cogent, and convincing evidence, and whether those findings of fact support a conclusion that parental rights should be terminated for one of the grounds set forth in N.C.G.S. § 7B-1111(a) (2003). In re Oghenekevebe, 123 N.C. App. 434, 439, 473 S.E.2d 393, 398(1996). Where an appellant does not assign error to the trial court's findings of fact, they are presumed to be supported by clear cogent and convincing evidence. In re Moore, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982). Where a trial court concludes that parental rights should be terminated pursuant to several of the grounds set forth in G.S. § 7B-1111(a), the order of termination will be affirmed if the court's conclusion with respect to any one of the statutory grounds is supported by valid findings of fact. In re Swisher, 74 N.C. App. 239, 240-41, 328 S.E.2d 33, 34-35 (1985).
With these principles in mind, we first address Mr. Pierce's argument that the trial court erred in concluding that there were grounds for termination of his parental rights. This argument is without merit.
N.C.G.S. § 7B-1111 (2003) provides:
(a) The court may terminate the parental rights upon a finding of one or more of the following:
(1) The parent has . . . neglected the juvenile. The juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be . . . a neglected juvenile within the meaning of G.S. 7B-101.
N.C.G.S. § 7B-101(15) (2003) defines the term "neglected juvenile" as follows:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile'swelfare; or who has been placed for care or adoption in violation of law.
"`Neglect may be manifested in ways less tangible than failure to provide physical necessities. Therefore, on the question of neglect, the trial judge may consider, in addition, a parent's complete failure to provide the personal contact, love, and affection that inheres in the parental relationship.'" In re Ore, 160 N.C. App. 586, 589, 586 S.E.2d 486, 488 (2003) (quoting In re Pierce, 67 N.C. App. 257, 263, 312 S.E.2d 900, 904 (1984)). In previous decisions, this Court has upheld findings of neglect where a parent, e.g., infrequently corresponded with the person taking care of the child and failed to inquire as to the well being of the child, see In re Bradshaw, 160 N.C. App. 677, 682, 587 S.E.2d 83, 86 (2003); infrequently communicated with the child, In re Graham, 63 N.C. App. 146, 151, 303 S.E.2d 624, 627 (1983); failed to provide financial support where able to do so, Bradshaw, 160 N.C. App. at 682, 587 S.E.2d at 86; and, inter alia, did not send a card or gift to acknowledge the child's birthday, In re Yocum, 158 N.C. App. 198, 204, 580 S.E.2d 399, 403, aff'd, 357 N.C. 568, 597 S.E.2d 674 (2003).
In the instant case, the trial court's unchallenged findings of fact indicate that Mr. Pierce consistently failed to provide A.R.P. with love and emotional support, made infrequent and lackluster attempts to communicate with A.R.P., did not ask about the child during the course of his dealings with DSS, did not provide the financial assistance that he was capable of providing, and did not acknowledge the child's birthdays. In light of theseunchallenged findings, the trial court did not err in concluding that these facts constituted neglect. Because the trial court's conclusion with respect to neglect is supported by the trial court's findings of fact, we need not address the other grounds pursuant to which Mr. Pierce's parental rights to A.R.P. were terminated. This assignment of error is overruled.
We next address Mr. Pierce's argument concerning the UCCJEA. Mr. Pierce alleges that, under the UCCJEA, the district court did not have jurisdiction to enter the order terminating his parental rights because he filed a petition to modify a child custody order in Montgomery County, New York on 9 November 2000. The record indicates that the child traveled to New York with her mother on 1 November 2000 and returned to North Carolina on or before 29 December 2000. The record further indicates that, with the exception of this brief trip to New York, A.R.P. has lived in North Carolina since 1996.
The provision of the UCCJEA implicated by Mr. Pierce's argument is N.C.G.S. § 50A-206 (2003), which provides:
(a) Except as otherwise provided in G.S. 50A-204 [temporary emergency jurisdiction], a court of this State may not exercise its jurisdiction under this Part if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this Article, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this State is a more convenient forum . . . .
(b) Except as otherwise provided in G.S. 50A-204 [temporary emergency jurisdiction], acourt of this State, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to G.S. 50A-209. If the court determines that a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this Article, the court of this State shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this Article does not determine that the court of this State is a more appropriate forum, the court of this State shall dismiss the proceeding.
(emphasis added). When there is an action pending in another state, "the trial court must answer the threshold question of whether the other state was exercising jurisdiction substantially in conformity with [the uniform act]." Davis v. Davis, 53 N.C. App. 531, 539-40, 281 S.E.2d 411, 416 (1981) (interpreting the UCCJA).
In the instant case, the record is bereft of any indication that, at the time Mr. Pierce moved for modification of the custody order pertaining to A.R.P., New York had jurisdiction as the home state pursuant to N.C.G.S. §§ 50A-201 and 202 (2003), had jurisdiction to modify pursuant to N.C.G.S. § 50A-203 (2003), or had temporary emergency jurisdiction under N.C.G.S. § 50A-204 (2003). Moreover, the record indicates that North Carolina did have jurisdiction under some or all of the foregoing provisions of the UCCJEA. As such, the district court did not err by declining to stay its proceedings to contact the New York court; rather, the district court properly concluded that it had jurisdiction to enterthe order terminating Mr. Pierce's parental rights as to A.R.P. This assignment of error is overruled.
Affirmed.
Judges GEER and THORNBURG concur.
Report per Rule 30(e).