IN THE MATTER OF CONNIE MARIE MOORE AND DONNIE LEE MOORE, MINORS

No. 5PA82

(Filed 13 July 1982)

1. **Parent and Child § 1— termination of parental rights—statute not unconstitutionally vague**

   The provisions of G.S. 7A-289.32(2) and (3), and G.S. 7A-278(4) are not unconstitutionally vague since people of common intelligence need not guess at their meaning and differ as to their application.

2. **Parent and Child § 1— petition for return of children—record not revealing counsel provided—question of due process not reached**

   The Court did not reach the question of whether due process requires that counsel be provided indigents when they petition for return of children since respondent failed to show that she did not have counsel, and the record is just as susceptible to interpretation that respondent had counsel as that she did not.

3. **Parent and Child § 1— termination of parental rights—showing children quite "neglected"**

   In a proceeding to terminate parental rights, the evidence showing that the children were "neglected" as that term is defined by G.S. 7A-517(21) was overwhelming where the evidence showed that the children did not "receive proper care, supervision, or discipline from" their parents, that they were not provided "necessary medical care," and that they lived "in an environment injurious to" their welfare.

4. **Parent and Child § 1— termination of parental rights—willfully leaving children in foster care for more than two years**

   In a proceeding to terminate parental rights, the trial court properly found that respondent willfully left the children in foster care for more than two years and substantial progress was not made to the court's satisfaction in correcting the conditions which led to the removal of the children where the evidence showed that the respondent left the children in foster care for more than four years, and that during three of those years she did not visit or communicate with them or make any serious effort to do so.

5. **Parent and Child § 1— termination of parental rights—failure to pay a reasonable portion of the cost of children's care**

   In a proceeding to terminate parental rights, the trial court properly found that respondent had failed for a period of six months to pay a reasonable portion of the cost of her children's care where the evidence was uncontradicted that the children were in the custody of DSS for a period of more than 36 months and that the respondent paid no part of the cost of their care during that period of time.

Justice MITCHELL concurring.

Justice MEYER joins in this concurring opinion.

Justice CARLTON dissenting.

ON certiorari to review order of *Yeattes, Judge,* entered 25 November 1980 in District Court, GUILFORD County.

This cause consists of two proceedings instituted in the district court in January 1980 to terminate the parental rights of Bruce Kelly Moore and Lillie Ruth Moore in two of their minor children, twins Connie and Donnie Moore. It appears that from the outset the two proceedings have been treated as one and they are so treated here.

On 7 February 1980 the father, Bruce Moore, executed a document releasing the children for adoption. Mrs. Moore timely filed an answer in which she opposed the relief sought by petitioner, the Guilford County Department of Social Services.[1] She also moved for a trial by jury and moved pursuant to G.S. 1A-1, Rule 12(b), that the proceedings be dismissed for failure to state a claim for relief. These motions were denied.

Following a lengthy hearing beginning on 24 September 1980 the court made findings of fact to which there is no exception. The facts, as found by the court and established by the record, are summarized in pertinent part as follows:

Connie and Donnie Moore were born on 27 July 1968. In December 1973 Mrs. Moore signed a dependency petition requesting that DSS take custody of the twins because their father was in jail and she was about to enter L. Richardson Hospital for psychiatric treatment. While she was hospitalized and immediately thereafter, employees of DSS counseled with her about leaving her husband, arranged for her to receive Supplemental Security Income benefits, and helped her locate an apartment.

The Moores reconciled in January 1974 and in February thereafter the court ordered the children returned to them. Both before and after the children were returned to their parents, a

---

1. Hereinafter the Guilford County Department of Social Services may be referred to as petitioner or DSS and Mrs. Moore may be referred to as respondent.

social worker stressed the importance of the family's not living with relatives, having separate rooms for the children, and family stability. Following the return of the children, the Moores continued to have contact with the DSS. At Mrs. Moore's request, a social worker arranged for the twins to have their preschool inoculations and to be enrolled in first grade.

When Connie began school she was reported as being disruptive in class, using vulgar language, hitting other children, and acting out sexual intercourse. She complained of vaginal pain. After her parents did not respond to attempts by school personnel to confer with them, on 15 November 1974 the principal went to the Moores' home and took them to the school for a conference. A social worker took Mrs. Moore and the children to a health clinic where Connie was treated for a vaginal inflammation. On the same day the DSS filed a petition alleging that both children were neglected.

A hearing was held pursuant to the petition in December and the parents were represented by counsel. Custody of the children was placed with the DSS, with Donnie to remain in the home under DSS supervision. Although Donnie was reported as sleeping a lot when he began school, there were no reports of disruptive behavior by him or of specific instances of neglect.

Mr. Moore's hostile behavior toward the female social worker then on the case caused DSS to assign another social worker, Richard Gainer, to the case. Mr. Gainer took over on 1 April 1975. After familiarizing himself with the Moore's records with DSS, Mr. Gainer went to the home for his first visit. Upon arrival he discovered that the Moores were facing eviction and that Mr. Moore was in hiding because he expected to be arrested for failing to comply with a court order to pay a sum of money. Mr. Moore was quite hostile and was drinking heavily at that time.

In April of 1975 Donnie was placed in a foster home. From that time until February of 1976 he lived in four foster homes. From 20 February 1976 to 24 July 1979 he lived in one foster home. The foster parents in this last home requested Donnie's removal rather abruptly when they began having serious marital problems. Between July of 1979 and September of 1980 he was in two foster homes. Altogether, he had been in six foster homes at the time of the termination hearing.

In re Moore

Between December of 1974 and the termination hearing in September 1980 Connie had been in either seven or nine foster homes. During this period Connie was also placed in North Carolina Memorial Hospital for psychiatric treatment and in Thompson Children's Home. Between May of 1980, when she left Thompson, and the termination hearing in September, she had been in two homes.

Mr. and Mrs. Moore continued to have economic and marital difficulties after the children were removed from their home. They moved frequently and applied to DSS for help in finding housing and for money. In December 1975 they filed a motion with the court seeking to have custody of the children returned to them. The court found that they were "still unfit" to have the children and dismissed the motion.

Since 1975 the Moores have had 16 different addresses in or near seven different cities or towns. Mrs. Moore left her husband in 1977 and after a two year separation, obtained a divorce on 8 October 1979.

Between December 1974 and September 1980 Mrs. Moore paid 11 visits to Connie and nine visits to Donnie. For a period of three years, July 1976 to July 1979, there were no visits nor any other communication with the children.

Mr. Gainer had some contact with Mrs. Moore in June and August of 1977 but did not try to involve her in Connie's therapy which was then in process. In September 1978 Mr. Moore telephoned Mr. Gainer and attempted to arrange a visit with the children, with his fiancee present. Mr. Gainer would not allow a visit in the presence of the fiancee and Mr. Moore did not visit. In May 1979 Mrs. Moore telephoned DSS indicating that she was living in the mountains, expected to get a divorce soon thereafter, wanted to see her children but had no way of getting to Greensboro.

In July of 1979 Mrs. Moore visited with Connie at the DSS office in Greensboro. Since Donnie had just been moved from his foster home of three years, Mr. Gainer thought it wise that he not see his mother at that time and scheduled an appointment for Mrs. Moore sometime later. Mrs. Moore had no way to get to Greensboro from the mountains for that visit and did not keep the appointment.

Mrs. Moore did not visit with either of the children again until after she received notice of the termination petition in February 1980. Mrs. Moore never gave either of the children a Christmas, Easter or birthday present while they were in foster care until after the termination petition was filed.

Meanwhile, DSS reached a decision to seek termination of the Moore's parental rights and to try to place the twins for adoption. The termination petition was filed on 17 January 1980. As stated above, Mr. Moore voluntarily released the children for adoption.

When Mrs. Moore received notice of the termination petition in February 1980, she employed a cab to drive her to Winston-Salem where she could get a bus to Greensboro. She lived with friends until she found a place in the country where she could have a garden and which she thought would be suitable for the children. She resumed counseling at Guilford County Mental Health Center and kept her appointments. She had some visits with the children. She also enrolled at Guilford Technical Institute for purpose of learning to read and doing basic arithmetic. She did not apply to DSS for financial or other aid.

Approximately six months after the termination petition was filed, on 2 July 1980, Mrs. Moore asked the social worker what amount of money she should pay for the children's support. Fifteen dollars per week was suggested although Mrs. Moore offered to pay $40 per week. Nothing was ever paid. DSS paid Thompson Children's Home $28,883.96 for Connie's care. Foster parents are paid $142.50 per month and the children receive Medicaid. DSS furnishes their clothing. Mrs. Moore testified at the termination hearing that she could not afford to pay anything for the children's support because her automobile insurance premium was unexpectedly high. Mrs. Moore owns a 1971 Cadillac, and another car, plus a pickup truck which she rents out for $50 per week. She also receives $218 per month in social security benefits. Her automobile insurance is $800 per year.

Mrs. Moore dropped out of the program at Guilford Technical Institute because she could not get to school on account of "gas problems." Further, although in February 1980 Mrs. Moore went to DSS and stated that she was then in a position to take care of the children and that she was going to move in with a brother in

Ashe County who had agreed to take both of the children, she later wondered if the brother was willing to have children with discipline problems and did not know if she could handle Connie's problems.

Donnie has been provided with counseling sessions with a psychiatrist due to the fact that he began "acting out" and being defiant. His behavior has improved considerably since 31 March 1980. Donnie does not want to return to his mother. His school performance has improved in his current foster placement and his work is much more stabilized and acceptable.

Although much improved, Connie still has some behavior problems and is slow academically. She is in a special education class.

Based on its findings of fact the trial court concluded as a matter of law that (1) Mrs. Moore has neglected the children; (2) she has wilfully left the children in foster care for more than two years and substantial progress has not been made to the court's satisfaction in correcting the conditions which led to the removal of the children; and (3) the children have been placed in the custody of the DSS and Mrs. Moore has failed for a period of six months to pay a reasonable portion of the costs of their care. The court ordered that the parental rights of Mrs. Moore be terminated and that the children remain in the custody of the DSS until such time as they can be placed for adoption.

Mrs. Moore appealed to the Court of Appeals and the record on appeal was duly served and filed in that court. Briefs were filed and the cause was heard on 1 September 1981. The Court of Appeals concluded that because the notice of appeal had not been filed within 10 days after entry of Judge Yeattes' order as G.S. 1-279(c) and Appellate Rule 3(c) require, the appeal must be dismissed for lack of appellate jurisdiction.

Mrs. Moore petitioned this court for discretionary review under G.S. 7A-31. This court treated the petition as one for a writ of certiorari to review the order of the trial court and allowed the petition on 12 January 1982.

*Judith G. Behar for appellant.*

*Margaret A. Dudley, Deputy County Attorney, for Guilford County Department of Social Services—appellee.*

BRITT, Justice.

### I.

The Court of Appeals properly dismissed respondent's appeal because of her failure to give timely notice of appeal.

The record on appeal reveals that while Judge Yeattes did not enter his formal written order until 25 November 1980, he announced his decision in open court on 25 September 1980 immediately after the hearing. G.S. 1-279(c) and Appellate Rule 3(c) provide that if oral notice of appeal is not given at trial, notice of appeal must be filed and served within 10 days after "entry" of the order or judgment. G.S. 1A-1, Rule 58, provides that "where judgment is rendered in open court, the clerk shall make a notation in his minutes as the judge may direct and such notation shall constitute the entry of judgment for the purposes of these rules. The judge shall approve the form of the judgment and direct its prompt preparation and filing."

It appears that respondent did not give oral notice of appeal at trial but filed and served her notice of appeal on 8 October 1980, 13 days after the "entry" of the order. Nevertheless, since we have allowed Mrs. Moore's petition for a writ of certiorari and have considered the appeal on its merits, the question of validity of the notice of appeal has become moot.

### II.

Respondent contends that the trial court erred in denying her motion to dismiss the petition to terminate her parental rights. She argues that the petition does not state a claim for relief for the reason that the "termination statutes" are unconstitutionally vague and do not provide for due process in light of the interests at stake. We find no merit in this contention.

[1] G.S. 7A-289.32 sets forth six separate grounds upon which a termination of parental rights order can be based. Portions of the statute pertinent to the case at hand are as follows:

> *Grounds for terminating parental rights.* —The court may terminate the parental rights upon a. finding of one or more of the following:

(1) . . .

(2) The parent has abused or neglected the child. The child shall be deemed to be abused or neglected if the court finds the child to be an abused child within the meaning of G.S. 110-117(1)(a), (b), or (c), or a neglected child within the meaning of G.S. 7A-278(4).

(3) The parent has willfully left the child in foster care for more than two consecutive years without showing to the satisfaction of the court that substantial progress has been made within two years in correcting those conditions which led to the removal of the child for neglect, or without showing positive response within two years to the diligent efforts of a county department of social services, a child-caring institution or licensed child-placing agency to encourage the parent to strengthen the parental relationship to the child or to make and follow through with constructive planning for the future of the child.

(4) The child has been placed in the custody of a county department of social services, a licensed child-placing agency, or a child-caring institution, and the parent, for a continuous period of six months next preceding the filing of the petition, has failed to pay a reasonable portion of the cost of care for the child.

\*     \*     \*

G.S. 7A-278(4) referred to in subsection (2) of the quoted statute was repealed by Chapter 815 of the 1979 Session Laws. The substance of former G.S. 7A-278(4) now appears as G.S. 7A-517(21) [1981 Replacement] as follows:

(21) Neglected Juvenile. — A juvenile who does not receive proper care, supervision, or discipline from his parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care or other remedial care recognized under State law, or who lives in an environment injurious to his welfare, or who has been placed for care or adoption in violation of law.

This court in *In Re Clark*, 303 N.C. 592, 281 S.E. 2d 47 (1981), upheld the constitutionality of subsection (4) quoted above. *See also In Re Biggers, Two Minor Children*, 50 N.C. App. 332, 274 S.E. 2d 236 (1981). We reaffirm our holding in *Clark.*

On the question of vagueness of a statute, this court in *In Re Burrus*, 275 N.C. 517, 531, 169 S.E. 2d 879 (1969), *aff'd*, 403 U.S. 528 (1971), an opinion authored by Justice Huskins, said:

> It is settled law that a statute may be void for vagueness and uncertainty. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." 16 Am. Jur. 2d, Constitutional Law § 552; *Cramp v. Board of Public Instruction*, 368 U.S. 278, 7 L.ed. 2d 285; 82 S.Ct. 275; *State v. Hales*, 256 N.C. 27, 122 S.E. 2d 768. Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met. *United States v. Petrillo*, 332 U.S. 1, 91 L.ed. 1877, 67 S.Ct. 1538.

275 N.C. at 531.

Further, in the case of *In Re Biggers, supra*, we find:

> A statute must be examined in the light of the circumstances in each case, and respondent has the burden of showing that the statute provides inadequate warning as to the conduct it governs or is incapable of uniform judicial administration. *State v. Covington*, 34 N.C. App. 457, 238 S.E. 2d 794, *rev. denied*, 294 N.C. 184, 241 S.E. 2d 519 (1977).

50 N.C. App. at 340.

Applying the standard set forth in *Burrus* and *Biggers*, and cases cited therein, we hold that the provisions of G.S. 7A-289.32(2) and (3), and G.S. 7A-278(4) quoted above are not un-

constitutionally vague. People of common intelligence need not guess at their meaning and differ as to their application.

[2] With respect to respondent's due process contention, she argues that while she and her husband were provided counsel when the decision to remove the children for neglect was first made in 1974, "the record does not show that they were represented or advised that they could be represented" when they petitioned the court in 1975 to return the children.

We do not reach the question of whether due process requires that counsel be provided indigents when they petition for a return of children. The presumption is in favor of the correctness of the proceedings in the trial court, *London v. London*, 271 N.C. 568, 157 S.E. 2d 90 (1967); *Gregory v. Lynch*, 271 N.C. 198, 155 S.E. 2d 488 (1967), and the burden is on the appellant to show error. *Gregory v. Lynch, supra.* Respondent has failed to show that she did not have counsel. Furthermore, the record is just as susceptible to interpretation that respondent had counsel as that she did not. Although the court order from the 19 December 1975 hearing did not reflect the presence of counsel for the parents, Richard Gainer testified that the Moore's attorney had the proceedings continued from the 12th to the 19th (R pp 16a, 50).

### III.

Respondent states her next contention as follows: "The trial court erred in denying respondent's motion to dismiss at the close of the state's evidence and at the close of all of the evidence when there was clear, cogent and convincing evidence that respondent had made substantial progress in correcting the conditions that had led to the children's removal for neglect, that she had not failed to pay a reasonable portion of the cost of their care, that petitioner had not diligently encouraged the respondent to strengthen her parental relationship to the children, and that respondent had not wilfully left her children in foster care for more than two years." Her final contention is that the trial court's conclusions of law are erroneous in that they are not supported by clear, cogent and convincing evidence. We find no merit in these contentions.

G.S. 7A-289.30(e) provides, *inter alia,* that in an adjudicatory hearing on a petition to terminate parental rights the court shall

find the facts and "all findings of fact shall be based on clear, cogent, and convincing evidence." It will be noted that the trial court is authorized to terminate parental rights "upon a finding of *one or more*" of the six grounds listed in G.S. 7A-289.32.

In the case at hand the trial court based its order terminating respondent's rights on three of the grounds set forth in the statute, (2), (3) and (4). The court concluded as a matter of law (a) that respondent had neglected the children; (b) that she had wilfully left the children in foster care for more than two years and substantial progress had not been made to the court's satisfaction in correcting the conditions which led to the removal of the children; and (c) the children had been placed in the custody of the DSS and respondent had failed for a period of six months to pay a reasonable portion of the costs of their care.

If either of the three grounds aforesaid is supported by findings of fact based on clear, cogent and convincing evidence, the order appealed from should be affirmed. We have set forth above a lengthy summary of the findings of fact and other facts established by the record. Since respondent did not except to any of the findings, they are presumed to be correct and supported by evidence. *Nationwide Homes of Raleigh, Inc. v. First Citizens Bank & Trust Co.*, 267 N.C. 528, 148 S.E. 2d 693 (1966); *Keeter v. Lake Lure*, 264 N.C. 252, 141 S.E. 2d 634 (1965). Nevertheless, we have reviewed the evidence and conclude that the findings are supported by clear, cogent and convincing evidence and the findings support all three of the conclusions of law.

[3] With respect to the first ground upon which the court based its termination order, evidence showing that the children were "neglected" as that term is defined by G.S. 7A-517(21) was overwhelming. In fact, practically all of the evidence tended to show that when the children were in respondent's charge they did not "receive proper care, supervision, or discipline from" their parents, that they were not provided "necessary medical care," and that they lived "in an environment injurious to" their welfare. The evidence was abundant that after the children were retaken by petitioner, respondent made very little effort to visit or even contact them for approximately three years. In fact, between July 1976 and July 1979 she did not visit them at all, or even send them a Christmas present. It is true that after the ter-

mination petition was filed, she began visiting the children and gave them gifts. Certainly the evidence showing neglect of the children was clear, cogent and convincing.

[4] The second ground for the court's termination order was that respondent wilfully left the children in foster care for more than two years and substantial progress was not made to the court's satisfaction in correcting the conditions which led to the removal of the children. As stated above, the evidence is abundant that respondent left the children in foster care for more than four years, and that during three of those years she did not visit or communicate with them or make any serious effort to do so. After the petition to terminate parental rights was filed, she made arrangements to visit the children and manifested some efforts to arrange a place for the children to live with her; however, even then she was not certain that she could take care of the children, particularly Connie. We think the evidence supporting the trial court's second ground for termination was clear, cogent and convincing.

[5] As to the third ground for termination, the undisputed evidence showed that the children were placed in the custody of petitioner in 1975 or 1976, that they continued in the custody of DSS until the petition was filed on 17 January 1980 (considerably more than 36 months), and that the respondent paid no part of the costs of their care during that period of time. Not only was this ground proven by clear, cogent and convincing evidence, there was no evidence to the contrary.

IV.

The county departments of social services have no greater responsibility than that imposed on them by our statutes relating to neglected children. In the case at hand we are convinced that petitioner has gone the "extra mile" in trying to stabilize respondent's home so that there would be a reasonable chance that a resumption of her parental responsibilities over Connie and Donnie would be successful. When the termination procedure was instituted, the children were 12-1/2 years old and their physical and emotional problems continued to be legion. Donnie had been in six different foster homes and Connie had been in seven or nine in addition to having been in a hospital for psychiatric treatment.

Having concluded that respondent would not be able to establish a stable home for the children, and that the children desperately need more stability in their home lives during the remainder of their minority, petitioner seeks to have respondent's parental rights terminated with the hope that the children might be adopted by people who will provide their needs. Respondent's plea seems to be "give me another chance, it *might* succeed."

The children are now 14, a very crucial period in their development to adulthood. The trial court concluded, in effect, that the course pursued by petitioner is in the best interest of the children and we find no reason to disturb that decision.

The decision of the Court of Appeals dismissing the appeal is vacated. The order of the trial court is

*Affirmed.*[2]

Justice MITCHELL concurring.

I share Justice Carlton's view that, when neglect is to be used as a statutory ground for terminating parental rights, a finding of neglect must be based on conduct reasonably close in time to the filing of the petition to terminate. I disagree with the majority view on this point only.

I concur in the opinion of the majority as it relates to the two remaining statutory grounds for termination of parental rights relied upon by the trial court. As either of these two grounds is adequate standing alone to support the judgment of the trial court, I also concur in the result reached by the majority.

Justice MEYER joins in this concurring opinion.

Justice CARLTON dissenting.

Believing that the majority has cavalierly applied our termination of parental rights statutes to the facts disclosed by the

2. We are advertent to the amendments to G.S. 7A-289 enacted by Chapter 1131 of the 1981 Session Laws (1982 Adjourned Session) ratified 11 June 1982. However, we conclude that said amendments do not relate to the questions presented by this appeal.

record before us, as fully discussed below, I dissent. This is a disturbing decision. The majority condones a horrible example of excessive governmental intrusion into the affairs of family. That this poor and pitiful family needs help from the state, there can be no doubt. Such help need not, and ought not, result in *extinguishing forever* the nourishing biological bond which exists between mother and children.

There are few losses, if any, more grievous than the abrogation of parental rights. No relationship is more precious in this life, nor treasured more highly, than that of parent and child. The law should treat that relationship with no less esteem. Applying the prevailing law in this jurisdiction to the record before us, the majority has failed to do so here. I fear that this decision creates a dangerous precedent for the future.

## I.

I strongly disagree with the majority's conclusion that the trial court had clear, cogent and convincing evidence before it, as required by G.S. 7A-289.30(e) (1981), to support its findings and conclusions that Mrs. Moore (1) had neglected her children as contemplated by G.S. 7A-289.32(2) (1981), (2) had willfully left the children in foster care for more than two years and substantial progress had not been made to the court's satisfaction in correcting the conditions which led to the removal of the children as contemplated by G.S. 7A-289.32(3) (1981), and (3) had failed for a period of six months, while the children were placed in the custody of the DSS, to pay a reasonable portion of the cost of their care as contemplated by G.S. 7A-289.32(4) (1981). I discuss below each of these statutory grounds for termination of parental rights and my reasons for disagreeing that each of them exists.

## A.

Turning first to the conclusion that these children were neglected as contemplated by G.S. 7A-289.32(2) (1981), I agree with the majority that we must look to G.S. 7A-517(21) (1981) for a definition of "neglect." The latter statute defines a neglected child as one who does not receive "proper care, supervision, or discipline from his parent, . . . ; or who has been abandoned; or who is not provided necessary medical care or other remedial care recognized under State law, or who lives in an environment

injurious to his welfare. . . ." I must also agree with the majority that in the very early years of these children's lives Mrs. Moore did not provide adequate care, supervision, or discipline and that the children lived "in an environment injurious" to their welfare. My reading of the record, however, indicates that this resulted from the abusive conduct of Mr. Moore and not from intentional neglect by Mrs. Moore.

My disagreement with the majority holding concerning this ground for termination of parental rights is with its *application* to this case. I believe that the plain language of the statute compels the conclusion that when neglect is to be used as a statutory ground for terminating parental rights, the court trying the termination matter must find that neglect on the basis of the parent's conduct just prior to the filing of the petition to terminate. I do not believe that the statute lends itself to the construction that one trial court's finding of neglect which led to the taking of the child *years before* can be relied on by the trial court trying the termination matter as a ground for termination. The two proceedings were for very distinct purposes. The former was simply to remove physical custody from the Moores. This proceeding is to eliminate forever Mrs. Moore's rights as a mother. The trial court here must have relied on the prior finding of neglect. Obviously, the trial court here could not find that a mother who had not had custody of her children for several years had neglected them, as neglect is defined by the statute.

In enunciating this statutory ground for terminating parental rights, I cannot imagine that our Legislature envisioned the ground to have unlimited application *in terms of time*. Here, the record discloses that the action for termination of parental rights was instituted in January of 1980. The last time Mrs. Moore had custody of Connie was in December of 1974. The last time Mrs. Moore had custody of Donnie was in April of 1975. In other words, for five years prior to the institution of this action, Mrs. Moore did not have custody of Connie and, for nearly five years, she did not have custody of Donnie. Clearly, Mrs. Moore could not "neglect" children, as contemplated by the statute, when they were not in her custody. In finding that the evidence was "overwhelming" that the children had been neglected, the majority refers only to evidence concerning the conduct of Mrs. Moore after custody had been granted to the DSS. The majority opinion

refers to the mother's failure to visit during the period custody was in the DSS and to her failure to send Christmas presents. Such evidence, I contend, has absolutely nothing to do with whether Mrs. Moore was neglectful to her children in the statutory context of providing proper care, supervision, discipline or necessary medical care. It most certainly has nothing to do with whether the children, at some point in time, may have lived in an environment injurious to their welfare.

In other words, reliance on this statutory ground for terminating parental rights requires, in my opinion, that the alleged neglect of the parent must have occurred within a reasonable period prior to the filing of the petition to terminate. To interpret the statute otherwise would be patently unjust. For example, a parent who might be neglectful as contemplated by the statute, to a one-year-old child resulting from that parent's alcoholism, might well be reformed and be capable of becoming a model parent several years later. In such a case, it would be surely unjust to allow that parent's parental rights to be terminated some four or five years later on the basis of his or her prior conduct. In this example, if the DSS had received custody of the child at the time the parent was neglectful due to his or her alcoholism and had not instituted an action for termination of parental rights due to the resulting neglect within a reasonable time after receiving custody, then I do not believe that this statutory ground should have any application whatsoever to a later proceeding to terminate parental rights. Should the petitioning party, in this example, believe that a parent's rights to parenthood should be terminated at such a late date, some other standard or ground for termination must be found.

So it is here. While there may have been evidence of neglect on the part of Mrs. Moore many years prior to the institution of this action, I cannot agree with the majority that there is any evidence, much less clear, cogent and convincing evidence, that Mrs. Moore was neglectful of these children during a reasonable time prior to institution of the action. For that reason, I would hold that this statutory ground was improperly applied by the trial court.

I would also add that any other interpretation of this statutory ground would, in my opinion, present a serious constitu-

tional problem. I do not believe that this statutory ground would survive a constitutional attack for failing to provide due process to a parent unless a reasonable time frame for its application is applied by the courts.

In summary, I would hold that this statutory ground had no application in this action for the reasons stated above and, should the trial court order be allowed to stand, another statutory ground supported by findings and conclusions based on clear, cogent and convincing evidence must be found.

### B.

The next ground relied on by the trial court for terminating Mrs. Moore's parental rights was that she had willfully left the children in foster care for more than two years and that substantial progress had not been made to the court's satisfaction in correcting the conditions which led to the removal of the children. G.S. 7A-289.32(3) (1981). Relying primarily on the fact that Mrs. Moore did not visit with her children for some three years while they were in foster care, the majority finds clear, cogent and convincing evidence to support this ground. Again, I believe the majority has applied an improper time frame to a ground for termination of parental rights. The majority acknowledges that, several months prior to the hearing, Mrs. Moore employed a cab to drive her to Winston-Salem where she could get a bus to Greensboro. There, she lived with friends until she found a place in the country where she could have a garden and which she thought was suitable for her children. She resumed counselling at Guilford County Mental Health Center and kept her appointments. She also visited with the children. She enrolled at Guilford Technical Institute to learn reading and basic arithmetic. The record also discloses that Mrs. Moore had taken other steps to correct the conditions that led to her children's removal for neglect. Other evidence in the record indicates that Mrs. Moore had taken other steps to improve her situation to properly raise her children. I am unable, therefore, to agree with the majority that no "substantial progress" had been made within two years in correcting the conditions leading to the removal of the children for neglect. Certainly, the evidence to support this ground is not clear, cogent and convincing.

I assume that the majority would answer this argument by noting that most of the progress made by Mrs. Moore which I referred to above occurred after the petition for termination was filed. This raises the question of what two-year period is referred to in G.S. 7A-289.32(3). The statute clearly, in my view, refers to the two years leading up to *the time of the hearing.* To interpret the statute otherwise would mean that the trial court must ignore evidence of substantial progress made by a parent during the sometimes lengthy period between the filing of the petition and the hearing, a manifest injustice. My view is buttressed by the enactment in 1979 of G.S. 7A-657 (1981). That statute now requires trial courts to review custodial removal orders within six months from entry and annually thereafter. This legislation clearly contemplates that progress may be made by a parent during the period immediately preceding a hearing.

The facts of this case highlight the necessity for interpreting the statute as I have above. Nowhere in this record do I find that the DSS presented Mrs. Moore with a plan of care for her children. This mother was given no specific directives as to what would be required of her to have custody of her children restored. I find no evidence that the DSS ever explained to Mrs. Moore that she might lose all her parental rights forever. The first she knew of this possibility, I assume, was when the petition was served on her. Surely, fundamental fairness and due process require that she be able *from that time to the time of the hearing* to show her ability to improve her situation for motherhood.

I also disagree with the majority that Mrs. Moore "willfully" left the children in foster care for more than two consecutive years. I consider the word "willfully" an extremely important one as used in this ground for termination of parental rights. This Court has had numerous occasions to consider the meaning of willfulness as used in statutes such as this. The word "imports knowledge and a stubborn resistance." *Mauney v. Mauney,* 268 N.C. 254, 150 S.E. 2d 391 (1966). One does not willfully fail to do something which it is not within his power to do. *Lamm v. Lamm,* 229 N.C. 248, 49 S.E. 2d 403 (1948). *See also, Matter of Dinsmore,* 36 N.C. App. 720, 245 S.E. 2d 386 (1978). Here, the record discloses that Mrs. Moore was unable, on numerous occasions, to comply with suggestions for improving the family situation due to the resistance of Mr. Moore. Indeed, a reading of this record com-

pels the conclusion that most of the problems in this family during these children's early years resulted from Mr. Moore's heavy drinking, his hostile and abusive actions directed at Mrs. Moore and the children, and the resulting intimidation suffered by Mrs. Moore. I glean from the record that Mrs. Moore was generally responsive to the DSS recommendations but was prevented from pursuing many of them due to Mr. Moore's hostile behavior toward the DSS workers. The majority opinion acknowledges that on one occasion Mrs. Moore telephoned the DSS indicating that she was living in the mountains, expected to get a divorce soon and wanted to see her children, but had no way of getting to Greensboro. The record is abundantly clear that Mrs. Moore was poor and illiterate and, in my view, simply unable to comply with various DSS recommendations. From such evidence, I am unable to find the "willfulness" required by the statute. Surely such evidence does not disclose "a stubborn resistance" or the ability to do all that she was expected to do.

In summary, I do not believe that Mrs. Moore acted "willfully" in leaving her children in foster care as contemplated by the statute and, even if she did, I do not believe that there is clear, cogent and convincing evidence in the record to support the trial court conclusion that she had made no substantial progress in correcting the conditions leading to the removal of the children during the two-year period *prior to the hearing.*

## C.

The third ground relied on by the trial court for terminating Mrs. Moore's parental rights was that the children had been placed in the custody of DSS and that she had failed for a period of six months to pay a reasonable portion of the cost of their care. G.S. 7A-289.32(4) (1981). The majority's conclusion that this ground was proven by clear, cogent and convincing evidence and that there was no evidence to the contrary is clearly erroneous. As the majority notes in its statement of facts, Mrs. Moore testified at the termination hearing that she could not afford to pay anything for the children's support.

Moreover, I think that the majority opinion completely ignores the specific language of G.S. 7A-289.32(4) (1981) and this Court's recent decision in *In re Clark,* 303 N.C. 592, 281 S.E. 2d 47 (1981). The statute specifically provides that, as a ground for ter-

minating parental rights, the child must have been placed in the custody of a child caring agency and the parent, "for a continuous period of six months next preceding the filing of the petition, has failed to pay a reasonable portion of the cost of care for the child." About this statute, this Court recently stated in *Clark*:

> A parent's ability to pay is the controlling characteristic of what is a "reasonable portion" of cost of foster care for the child which the parent must pay. A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay. What is within a parent's "ability" to pay or what is within the "means" of a parent to pay is a difficult standard which requires great flexibility in its application. G.S. 7A-289.32(4) requires a parent to pay a *reasonable* portion of the child's foster care cost. The requirement applies irrespective of a parent's wealth or poverty. . . . *The burden of DSS on the merits of the petition is a heavy one. The statute requires that all findings of fact be based on clear, cogent and convincing evidence.* G.S. 7A-289.30(e).

303 N.C. at 604, 281 S.E. 2d at 55 (emphasis added).

Here, I find no clear, cogent and convincing evidence concerning this mother's ability to pay during the six months immediately preceding the filing of the petition. There are no findings concerning her ability to pay in order to determine what is a "reasonable portion" of the cost of foster care. Moreover, I find nothing in the record to indicate that the DSS ever asked Mrs. Moore for support prior to filing the papers for termination, nor was there ever any agreement for her to pay. In my view, the DSS did not carry the heavy burden required by this Court's decision in *Clark*. Indeed, I find little in the record to support any conclusion that this mother could afford to pay any portion of the children's foster care.

## II.

I must also disagree with the majority's closing conclusion that the trial court's decision was in the best interest of the children. From the record before us, I see absolutely nothing to be gained on behalf of these children by terminating their mother's parental rights. I find nothing in this record to indicate

that the DSS had taken any steps to find adoptive parents for these children. Indeed, nothing appears to indicate that Connie and Donnie, now fourteen years of age and obviously still suffering from some emotional problems, are adoptable. I doubt that they are adoptable and suspect they will remain in foster care until they attain majority, regardless of the disposition of this case.

On oral argument, I asked counsel for the DSS why, in light of my belief that the children were probably not adoptable, did the DSS initiate these proceedings. I quote the pertinent parts of her reply:

> Because, starting three years ago . . . Guilford County began a concentrated effort to review the status of every child in foster care regardless of age, and we did begin with the younger children, with the objective in mind that we would take every effort possible to place children for adoption regardless of their age. Guilford County, through its Social Services Board, has expended great funds to contract with agencies, particularly one in . . . Minnesota, who specialize in hard to place children. We believe that every child who is in our care regardless of age has a responsibility from us to get every reasonable effort to get that child adopted. And we have had success in placing hard to place children and old children and minority children. . . . The specific answer to your question is that the administrators at the DSS and the appointed board have decided that we will make concentrated effort to make sure that children do not grow up in foster care and do not fall through the administrative cracks in the foster care process.

Counsel then went on to explain that no steps toward determining adoptability are taken until parental rights have been terminated. She also noted that the county had experienced situations in which adoptive parents of older children allowed visitation from natural parents. She then noted that the county was still "experimenting" with different approaches.

I commend Guilford County for attempting new approaches to a most difficult problem and for taking steps to ensure that foster children do not fall through the "administrative cracks." Counsel was most articulate in presenting the county's case. The county's approach may well be the wisest in most cases, particularly those which are uncontested.

I cannot agree, however, that this approach comports either with our statute or fundamental fairness in a contested case involving older children such as this. When a parent of an older child resists the termination efforts, as here, I believe the county has the burden to show that the child is adoptable before termination should be allowed. G.S. 7A-289.22(2) expressly requires a recognition of "*the need to protect all children from the unnecessary severance of a relationship with biological parents.*" (Emphasis added.)

The strong ties resulting from the biological relationship of parent and child has been traditionally recognized by the courts. The United States Supreme Court has spoken on this issue more than once. The rights to conceive and raise one's children have been deemed "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and "[r]ights far more precious . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953).

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Moreover, the integrity of the family unit has found protection in the due process clause of the fourteenth amendment, the equal protection clause of the fourteenth amendment, and the ninth amendment. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed. 2d 551 (1972). No greater emotional attachment exists than that resulting from the biological relationship of parent and child. *See Smith v. Organ. of Foster Families for E. & Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed. 2d 14 (1977).

To conclude, as has the majority, that a child's best interests will be served by termination of parental rights is not only unsupportable from a record which discloses no better potential situation for the child than now exists, such a conclusion completely ignores the vital familial interests at stake for both parent and child. When the county prevails in termination of parental rights, it does not merely infringe on a fundamental liberty, it ends it

forever. "Few forms of state action are both so severe and so irreversible." *Santosky v. Kramer*, --- U.S. ---, ---, 102 S.Ct. 1388, 1397, 71 L.Ed. 2d 599, 610 (1982). When the serious results of such proceedings are properly viewed, I believe that this Court should insist on the most strict interpretation of our statutes.

As the United States Supreme Court recently stated in *Santosky*:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

--- U.S. at ---, 102 S.Ct. at 1394, 71 L.Ed. 2d at 606.

Here, I do not believe that the majority has recognized the "critical need for procedural protections" to protect this family, nor has it provided this parent with "fundamentally fair procedures." I have explained above my belief that the three statutory grounds were improperly utilized by the trial court and my belief that a finding of adoptability of children of this age is essential *prior to termination of parental rights*. We must remember that the purpose of these proceedings is not to *punish* the parent; it is to *protect* the children's best interests. Given the record before us, I see no protection for the children by terminating the parental rights of this mother. I do see, however, the most serious form of punishment to this mother.

From this record, this Court can only assume that Connie and Donnie will continue to reside in foster homes even if the trial court's order is allowed to stand. While I agree that Mrs. Moore is not yet ready to assume physical custody of her children, all parties (society as well) will be better served if the county attempts to help Mrs. Moore strengthen her ability as a parent.

### III.

Finally, I wish to make it clear that I agree with the implementation of legislation that allows, in appropriate cases and with adequate procedural safeguards, termination of parental rights. By this dissent, I do not attack the legitimacy of the *ends* sought; rather, I would treat more seriously the *means* used to achieve those ends than does the majority. On the facts disclosed by this record, I do not believe the ends sought justify the means employed.

I vote to reverse.