IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-98

No. 459A20

Filed 27 August 2021

IN THE MATTER OF: K.N. & K.N.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 29 July 2020 by Judge William J. Moore in District Court, Robeson County. This matter was calendared in the Supreme Court on 21 June 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*J. Edward Yeager, Jr., for petitioner-appellee Robeson County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant father.*

NEWBY, Chief Justice.

¶ 1    Respondent-father appeals from an order terminating his parental rights to K.N. and K.N. (Kevin and Kimberly)[1]. For the reasons set forth herein, we affirm the order terminating his parental rights.

¶ 2    Kevin was born in February 2012 and Kimberly was born in August 2015. The Robeson County Department of Social Services (DSS) first became involved with the

---

[1] Pseudonyms are used to protect the identity of the juveniles and for ease of reading.

family in 2015 after it received information that Kevin, Kimberly, respondent, and the children's mother were homeless and living in their car. The family thereafter obtained housing.

¶ 3        On 31 May 2017, DSS again received a neglect referral alleging that the family was homeless and that respondent was inappropriately disciplining the children. On 21 June 2017, DSS learned that the family had been kicked out of the homeless shelter where they were staying and went to stay with relatives in a home that had no running water. On 21 June 2017, a child and family team meeting was held with the family to discuss placement options, but the parents were unable to provide relatives or family friends to assist in serving as a safety resource for the family.

¶ 4        Thereafter, on 22 June 2017, DSS obtained nonsecure custody of Kevin and Kimberly[2] and filed juvenile petitions alleging them to be neglected juveniles. On 12 July 2017, the nonsecure custody order was dismissed, and the children were placed back into the home of respondent and mother.

¶ 5        On 6 September 2017, however, DSS again obtained nonsecure custody of the children and filed amended juvenile petitions based upon unstable, inadequate, and unsuitable housing for the children and their observing respondent engaging in violence. Thereafter, on 12 October 2017, respondent and mother entered into family

_____

[2] DSS also obtained nonsecure custody of Kevin and Kimberly's younger sibling and filed a juvenile petition alleging that he was a neglected juvenile. That child, however, is not a subject of this appeal.

services case plans. Specifically, respondent's plan intended to address issues of mental health, parenting, substance abuse, housing, and employment. Subsequently, respondent and mother obtained housing for four months because the Southeastern Family Violence Center paid the rent during that time. After the Center stopped paying rent, however, respondent and mother were evicted in the spring of 2018 because they could not pay.

¶ 6 On 26 February 2018, the trial court entered an order adjudicating Kevin and Kimberly to be neglected juveniles. In a separate disposition order, the trial court ordered respondent to submit to a psychological evaluation, mental health assessment, and substance abuse assessment. Custody of the children remained with DSS. The permanent plan was set as reunification with mother, with a concurrent plan of adoption. The parents received bi-weekly visitation with the children.

¶ 7 In March of 2018, the trial court found that respondent alleged that he had obtained work but could not provide proof of income. Respondent stated that though he was employed, he had not been working much. Respondent completed a substance abuse assessment but only sporadically engaged in the required services and missed multiple visitations. At the hearing, the trial court told respondent and mother that if they did not become compliant on their case plans, the court would look at focusing efforts on a primary plan of adoption.

¶ 8 On 12 April 2018, respondent and mother informed DSS that they were

thinking about moving to Michigan. Thereafter, DSS made several attempts to locate respondent before he eventually contacted DSS in mid-May. Respondent informed DSS that he and mother were living in Michigan, searching for employment and housing, and planning to begin classes at Community Mental Health. In July of 2018, DSS learned that respondent and mother were receiving substance abuse counseling.

On 31 July 2018, however, respondent pled guilty and thereafter was convicted of domestic violence and assault in Michigan based upon domestic violence between respondent and mother. In August of 2018, DSS received an email from St. Clair County DSS in Michigan reporting that mother was residing at a women's shelter and respondent was in the St. Clair County Jail.

On 5 September 2018, the trial court held a hearing and subsequently entered an order finding that respondent had moved to Michigan and had not made himself available to work on any plan to remove his children from foster care. The trial court ordered DSS to "primarily focus its efforts" on the plan of adoption and established a concurrent plan of reunification with respondent and mother.

On 11 September 2018, DSS received a call from mother, who reported that she was four months pregnant and that she had been to the clinic at the women's shelter, though she had not seen an OB/GYN. Respondent was released from jail on 18 September 2018.

Based on all of the incidents above, on 24 October 2018, DSS filed a petition to

terminate respondent's parental rights in Kevin and Kimberly.[3] DSS alleged that respondent had neglected the children, *see* N.C.G.S. § 7B-1111(a)(1) (2019), willfully left the children in DSS custody for over twelve months without making reasonable progress to correct the conditions that led to their removal, *see* N.C.G.S. § 7B-1111(a)(2), and willfully failed to pay a reasonable portion of the cost of care for Kevin and Kimberly although physically and financially able to do so, *see* N.C.G.S. § 7B-1111(a)(3).

Several months after the petition was filed, respondent contacted DSS and stated that he was working, had completed parenting classes and substance abuse treatment, and was looking for housing. Respondent and mother came to North Carolina for a court hearing on 7 March 2019 and provided certificates verifying completion of services. They had one visit with the children that day. On 20 March 2019, however, DSS learned that Michigan DSS had filed a non-secure order and taken custody of respondent and mother's newborn due to neglect.

In July of 2019, respondent contacted DSS and alleged that he had completed inpatient therapy. On 8 October 2019, however, a social worker from Michigan DSS reported that respondent had not completed parenting classes and had missed four drug screens. During the spring of 2020, DSS learned that Michigan DSS had received permission to file for termination of parental rights for respondent and

---

[3] DSS also terminated mother's parental rights, but she is not a party to this appeal.

mother's newborn.

Following a hearing on 25 June 2020, the trial court entered an order on 29 July 2020 concluding that grounds existed to terminate respondent's parental rights in Kevin and Kimberly pursuant to N.C.G.S. § 7B-1111(a)(1)–(3). The trial court also concluded that it was in Kevin and Kimberly's best interests that respondent's parental rights be terminated. Thus, the trial court terminated respondent's rights. Respondent appeals.

On appeal respondent contends that the trial court failed to include a jurisdictional finding in its order terminating his parental rights. He also contends that in terminating his rights pursuant to N.C.G.S. § 7B-1111(a)(1) (neglect) and (2) (willfully leaving the children in DSS custody for over twelve months without making reasonable progress to correct the conditions that led to their removal), the trial court failed to consider evidence that occurred after the petition filing date. Finally, respondent argues that there was insufficient evidence to support terminating his rights under N.C.G.S. § 7B-1111(a)(3) (failing to pay a reasonable portion of childcare costs).

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796–97 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving

by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019). Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019).

## I.     Subject Matter Jurisdiction

Respondent contends the trial court lacked subject matter jurisdiction to terminate his parental rights. Respondent acknowledges that the record supports jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) because North Carolina is the "home state" for Kevin and Kimberly. *See* N.C.G.S. § 50A-201 (2019). Nonetheless, respondent contends the trial court failed to comply with the requirements of N.C.G.S. § 7B-1101 (2019) by not making an explicit finding that it had jurisdiction under N.C.G.S. § 50A-201. Thus, respondent contends

that the termination order is void.

¶ 19    "In matters arising under the Juvenile Code, the court's subject matter jurisdiction is established by statute." *In re K.J.L.*, 363 N.C. 343, 345, 677 S.E.2d 835, 837 (2009). Parties may challenge subject matter jurisdiction at any time. *In re T.R.P.*, 360 N.C. 588, 595, 636 S.E.2d 787, 793 (2006). Notably, however,

> "where the trial court has acted in a matter, every presumption not inconsistent with the record will be indulged in favor of jurisdiction . . . ." Nothing else appearing, we apply "the *prima facie* presumption of rightful jurisdiction which arises from the fact that a court of general jurisdiction has acted in the matter." As a result, "[t]he burden is on the party asserting want of jurisdiction to show such want."

*In re N.T.*, 368 N.C. 705, 707, 782 S.E.2d 502, 503–04 (2016) (first quoting *Cheape v. Town of Chapel Hill*, 320 N.C. 549, 557, 359 S.E.2d 792, 797 (1987), then quoting *Williamson v. Spivey*, 224 N.C. 311, 313, 30 S.E.2d 46, 47 (1944), and then quoting *Dellinger v. Clark*, 234 N.C. 419, 424, 67 S.E.2d 448, 452 (1951)).

¶ 20    A trial court's subject matter jurisdiction over a petition to terminate parental rights is conferred by N.C.G.S. § 7B-1101, which provides that

> [t]he court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of the filing of the petition or motion. . . . The court shall have jurisdiction to terminate the parental rights of any parent irrespective of the state of residence of the parent. Provided, that before exercising

jurisdiction under this Article regarding the parental rights of a non-resident parent, the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201 or G.S. 50A-203, without regard to G.S. 50A-204 and that process was served on the nonresident parent pursuant to G.S. 7B-1106.

N.C.G.S. § 7B-1101 (2019). N.C.G.S. § 50A-201 and N.C.G.S. § 50A-203 (2019) are provisions of the UCCJEA. Relevant to this matter, subparagraph (a)(1) of N.C.G.S. § 50A-201 provides:

> (a) . . . a court of this State has jurisdiction to make an initial child-custody determination only if:
>
> > (1) This State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this State but a parent or person acting as a parent continues to live in this State.

N.C.G.S. § 50A-201(a)(1). N.C.G.S. § 50A-203 provides the limited circumstances where "a court of this State may . . . modify a child-custody determination made by a court of another state." N.C.G.S. § 50A-203.

While respondent argues the trial court failed to comply with N.C.G.S. § 7B-1101 by not making an explicit finding that it had jurisdiction under N.C.G.S. § 50A-201, this Court has previously considered and rejected this argument. We have determined that "[t]he trial court is not required to make specific findings of fact demonstrating its jurisdiction under the UCCJEA, but the record must reflect that

the jurisdictional prerequisites of the Act were satisfied when the court exercised jurisdiction." *In re L.T.*, 374 N.C. 567, 569, 843 S.E.2d 199, 200–01 (2020); *see also In re A.S.M.R.*, 375 N.C. 539, 545–46, 850 S.E.2d 319, 323–24 (2020) ("Here, as in *In re L.T.*, the lack of explicit findings establishing jurisdiction under the UCCJEA does not constitute error because the record unambiguously demonstrates that 'the jurisdictional prerequisites in the Act were satisfied.' " (quoting *In re L.T.*, 347 N.C. at 569, 843 S.E.2d at 201)).

¶ 22        Here the trial court made the finding that "the Court has jurisdiction over the parties and the subject matter herein pursuant to Article 11 of Chapter 7B of the North Carolina General Statutes." Notably, the record supports this determination. The record establishes that respondent moved to Michigan several months before the filing of the termination petition. The children's home state, however, is North Carolina and has been since the commencement of termination proceedings; Kevin and Kimberly lived with their foster parents for more than six consecutive months immediately preceding the filing of the termination petition. *See* N.C.G.S. § 50A-201(a)(1) (2019); N.C.G.S. § 50A-102(7) (defining "home state" under the UCCJEA as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding"); *In re N.P.*, 376 N.C. 729, 2021-NCSC-11, ¶ 13 (concluding that where the juvenile was born in North Carolina and lived with foster

parents in the state for the six months immediately preceding the termination petition filing, the trial court's determination that North Carolina was the home state was consistent with the UCCJEA and N.C.G.S. § 50A-201(a)(1)). Accordingly, the trial court had jurisdiction over this case.

## II.    Grounds for Termination

Next respondent challenges the trial court's determination that grounds existed to terminate his parental rights.

### A.  N.C.G.S. § 7B-1111(a)(1)–(2)

Respondent contends the trial court erred by terminating his parental rights under N.C.G.S. § 7B-1111(a)(1) (neglect) and (2) (willfully leaving the children in DSS custody for over twelve months without making reasonable progress to correct the conditions that led to their removal) because it "operated under a misapprehension of law that post-petition facts were irrelevant and unnecessary." Respondent does not challenge any findings of fact as unsupported but instead contends that the trial court may have reached a different conclusion if it had correctly understood the significance of assessing events that occurred after the termination petition's filing. Respondent directs our attention to an objection made by counsel for DSS during the cross-examination of DSS Supervisor Vanessa McKnight. DSS counsel objected to testimony about evidence that occurred after the date the termination petition was filed, stating that the standard for termination was to look at what "happened prior

to the date of the filing of the action." The trial court disagreed, however, allowing McKnight to testify.

¶ 25        Respondent also believes the trial court failed to consider any evidence after the petition was filed because DSS's only witness for the first part of the hearing was McKnight, who testified that she stopped supervising respondent's case on 24 October 2018 and thus could not provide information after that date. Respondent concedes, however, that the trial court received into evidence and considered DSS's "Termination of Parental Rights Timeline," which recounted numerous events that occurred after the filing of the termination petition. Nonetheless, respondent argues that, because the trial court did not require any other witnesses to testify, "the trial court clearly signaled that it did not anticipate or see the need for" evidence of events following 24 October 2018. Thus, respondent contends that he was prejudiced since "[t]here is simply no way to know what determinations the trial court may have made had it correctly understood the legal significance of that progress." Therefore, respondent requests that the termination order be vacated and remanded so that the trial court can conduct a new hearing considering the facts following the termination petition's filing date.

¶ 26        A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined in pertinent part as a juvenile

"whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15). "To terminate parental rights based on neglect, 'if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent.' " *In re D.L.A.D.*, 375 N.C. 565, 567, 849 S.E.2d 811, 814 (2020) (quoting *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016)). In this situation, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights," but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984).

¶ 27 Pursuant to N.C.G.S. § 7B-1111(a)(2), a trial court may terminate parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2) (2019). "[T]he willfulness of a parent's failure to make reasonable progress toward correcting the conditions that led to a child's removal from the family home 'is established when

the [parent] had the ability to show reasonable progress, but was unwilling to make the effort.' " *In re L.E.W.*, 375 N.C. 124, 136, 846 S.E.2d 460, 469 (2020) (quoting *In re Fletcher*, 148 N.C. App. 228, 235, 558 S.E.2d 498, 502 (2002)). "[T]he nature and extent of the parent's *reasonable progress* . . . is evaluated for the duration leading up to the hearing on the motion or petition to terminate parental rights." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020) (quoting *In re A.C.F.*, 176 N.C. App. 520, 528, 626 S.E.2d 729, 735 (2006)). This Court has recognized that "parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2)." *In re B.O.A.*, 372 N.C. at 384, 831 S.E.2d at 313.

Our case law clearly states that in determining whether future neglect is likely, the trial court must consider evidence of changed circumstances between the period of past neglect and the time of the termination hearing. *In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797. Similarly, in evaluating the nature and extent of a parent's reasonable progress in correcting the conditions that led to the children's removal, the trial court must consider the parent's progress leading up to the termination hearing. *In re J.S.*, 374 N.C. at 815, 845 S.E.2d at 71. Though it appears that counsel for DSS misstated this law during her objection to McKnight's testimony, the trial court overruled the objection and allowed McKnight to continue with her testimony.

The record does not indicate that counsel's misstatement of the law impacted the trial court in any way.

¶ 29    Moreover, though McKnight's testimony at the hearing was limited to the time immediately preceding the filing of the termination petition, the record indicates that the trial court admitted post-petition evidence during the proceeding and considered post-petition evidence in making its findings of fact and conclusions of law. During the adjudicatory stage of the termination hearing, the trial court took judicial notice of the children's underlying file, which included several court orders from hearings conducted after the filing of the termination petition. In addition, DSS introduced and the trial court admitted into evidence, without objection from respondent's counsel, a "Termination of Parental Rights Timeline" exhibit, which the trial court stated that it relied upon in making its findings. The timeline, which was signed and submitted by McKnight and DSS Social Worker McKoy, detailed DSS's involvement with respondent from December 2012 until the time of the termination hearing in June 2020. This timeline addressed numerous events that occurred after the filing of the termination petition on 24 October 2018.

¶ 30    The trial court's unchallenged findings, which are binding on appeal, establish that Kevin and Kimberly entered DSS custody on 21 June 2017 based on the family's homelessness and allegations of inappropriate discipline by respondent. The children were subsequently adjudicated neglected based on these allegations and respondent

and mother's repeated failure to secure housing. Respondent entered into a case plan in October 2017 in which he agreed to complete a substance abuse assessment and submit to random drug screens, locate housing, and obtain employment. Initially, respondent obtained housing for four months through funding paid by the Southeastern Family Violence Center. Once the Southeastern Family Violence Center discontinued paying the rent, however, respondent was evicted for failure to pay. In May of 2018, respondent informed a DSS social worker that he and mother had moved and were living in Michigan. Though respondent began receiving substance abuse counseling, in August of 2018 respondent was convicted of domestic violence and assault and was released from jail on 18 September 2018.

¶ 31        Moreover, the trial court made the following findings of fact related to events occurring after the 24 October 2018 termination petition filing:

> 21. On January 25, 2019, SWS Vanessa McKnight received a telephone call from [respondent]. [Respondent] reported that he was working two jobs. [Respondent] reported that he was coming to court in March, 2019.
>
> 22. On February 26, 2019, Social Worker received a telephone call from [mother]. [Mother] reported that she and [respondent] have completed parenting classes and substance abuse treatment. [Mother] stated that they were in the process of obtaining housing.
>
> 23. On March 7, 2019, the parents were present for court and provided to the court, certificates verifying completion of services. The parents visited with the children on March 8, 2019 and this was the last time the parents had a face to face visit with their children.

24. On March 20, 2019, SWS Anthony Maynor received a telephone call from Ms. Amanda Temple in Michigan, stating that they had filed a non-secure order and taken custody of [the] newborn due to neglect.

25. On July 11, 2019, Social Worker received a call from [respondent] informing worker that he was discharged from inpatient treatment with Sacred Hearts in Richmond, Michigan. [Respondent] reported that he is scheduled to begin outpatient treatment that is being offered by Michigan Department of Social Services on July 26, 2019.

26. On October 8, 2019, Tim Aiello, Michigan Social Worker reported [mother] has completed parenting classes; however, [respondent] has not completed parenting classes. [Mr.] Aiello reported that [respondent] has missed four drug screens and [mother] has missed six screens.

27. [In March 2020,] Mr. Tim Aeillo, Michigan Social Worker reported to Social Worker that . . . they received permission from the Court to file the Termination of Parental Rights on [mother] and [respondent's] new baby.

¶ 32    From the trial court order, it is clear the court considered evidence after the date of the termination petition's filing but determined that such evidence was unpersuasive and inadequate to overcome evidence supporting termination under N.C.G.S. § 7B-1111(a)(1) and (a)(2). This appears especially so given that Michigan DSS proceeded with terminating the rights to respondent and mother's youngest child. Notably, the trial court can determine what weight to give any evidence of events occurring after the termination petition is filed; it is not up to this Court to reweigh how the trial court balanced that evidence. *See In re Z.A.M.*, 374 N.C. 88,

100, 839 S.E.2d 792, 800 (2020) (noting that "the trial court, which is involved in the case from the beginning and hears the evidence, is in the best position to assess and weigh the evidence, find the facts, and reach conclusions based thereon"). Thus, the unchallenged findings support the conclusion that the trial court considered the totality of the evidence, both before and after the petition's filing, in determining that respondent's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) and (a)(2).

### B. N.C.G.S. § 7B-1111(a)(3)

¶ 33        Respondent also argues that the trial court erred in terminating his rights under N.C.G.S. § 7B-1111(a)(3). Because the trial court properly terminated respondent's parental rights based on N.C.G.S. § 7B-1111(a)(1)–(2), we need not address this argument. *See In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982) (holding that an appealed order should be affirmed when any one of the grounds of the trial court is supported by findings of fact based on clear, cogent, and convincing evidence); *see also* N.C.G.S. § 7B-1111(a) (2019) ("The court may terminate the parental rights upon a finding of one or more [grounds for termination.]"). Accordingly, we affirm the trial court's termination order.

AFFIRMED.