IN THE SUPREME COURT OF NORTH CAROLINA

No. 300A19

Filed 5 June 2020

IN THE MATTER OF: J.M.J.-J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 16 May 2019 by Judge Wesley W. Barkley in District Court, Caldwell County. This matter was calendared for argument in the Supreme Court on 4 May 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Lucy R. McCarl, Staff Attorney, for petitioner-appellee Caldwell County Department of Social Services.*
>
> *Poyner Spruill LLP, by Christopher S. Dwight and John M. Durnovich, for appellee Guardian ad Litem.*
>
> *Mercedes O. Chut for respondent-appellant father.*

MORGAN, Justice.

Respondent-father appeals from the trial court's order terminating his parental rights to J.M.J.-J. (Julie).[1] After careful consideration of respondent's challenges to the trial court's conclusion that grounds existed to terminate respondent's parental rights, we affirm.

---

[1] The minor child, J.M.J-J., will be referred to throughout this opinion by the pseudonym "Julie" to protect the identity of the child and for ease of reading.

On 22 August 2017, the Caldwell County Department of Social Services (DSS) obtained nonsecure custody of Julie and filed a juvenile petition alleging that Julie was a neglected and dependent juvenile. At that time, Julie was living with her mother, and DSS alleged that Julie had a Child Protective Services history which included allegations of living in a home with substance abuse, improper supervision, and improper care. DSS claimed that Julie's mother had failed to address serious issues of substance abuse and mental health concerns which had placed Julie at risk of harm, as well as that Julie lacked an appropriate alternative caregiver.

DSS filed an amended juvenile petition on 6 September 2017 that provided further details concerning the mother's substance abuse and mental health issues. It also contained allegations regarding respondent and his role in Julie's circumstances. DSS alleged that respondent had an extensive criminal history that included charges pertaining to domestic violence and controlled substances. Additionally, DSS claimed that respondent had reported to a social worker his "knowledge of [Julie's] mother['s] on-going substance use, and [her] failure to take any action in regards to [Julie's] safety."

On 29 November 2017, Julie was adjudicated to be a neglected and dependent juvenile. Respondent did not contest the allegations contained in either the original juvenile petition or the amended juvenile petition. On the same date as the adjudication, the trial court entered a separate disposition order. The trial court ordered that custody of Julie should remain with DSS. The trial court further ordered

that respondent should complete a case plan and attend all visitation with Julie as ordered by the trial court, but conditioned visitation with Julie on respondent's completion of "one drug screening that is negative for all illegal and/or non-prescribed controlled substances, and begin[ning] participat[ion] in the activities of his case plan with [DSS] and as ordered by the court."

The trial court held a permanency planning hearing on 30 May 2018. At that time, respondent had visited with Julie only once since she had been in DSS custody. Respondent had not begun parenting education classes as required by his case plan. A hair follicle drug screen administered to respondent yielded a positive result for the presence of hydrocodone and oxycodone. A home study for respondent's residence had been completed but was denied. Consequently, on 14 June 2018, the trial court entered an order in which it authorized DSS to cease reunification efforts with both parents and changed the primary permanent plan for Julie to adoption.

On 2 August 2018, DSS filed a petition to terminate the parental rights of respondent and Julie's mother. DSS alleged grounds to terminate respondent's parental rights to Julie based on neglect and abandonment. *See* N.C.G.S. § 7B-1111(a)(1), (7) (2019). On 16 May 2019, the trial court entered an order concluding that grounds existed to terminate respondent's parental rights based on both grounds alleged in the petition. The trial court further concluded that termination of

respondent's parental rights was in Julie's best interests.[2] Accordingly, the trial court terminated respondent's parental rights. Respondent appeals.

Respondent argues that several of the trial court's findings of fact are not supported by the evidence and that the trial court erred in concluding that grounds existed to terminate respondent's parental rights. A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of at least one ground for termination under Section 7B-1111(a) of the General Statutes of North Carolina. N.C.G.S. § 7B-1109(e)–(f). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). If the petitioner meets its burden during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110 (2015)).

---

[2] The trial court's order also terminated the parental rights of Julie's mother, but she did not appeal the order and is not a party to the proceedings before this Court.

In this case, the trial court concluded that the ground of neglect existed to terminate respondent's parental rights. The tribunal also concluded that petitioner DSS had established the existence of the ground of abandonment. With only one ground being required to be present under N.C.G.S. § 7B-1111 in order to proceed to the dispositional stage of a termination proceeding, we begin our analysis here with a consideration of the ground of neglect. *See* N.C.G.S. § 7B-1111(a)(1) (2019). Section 7B-1111(a)(1) allows for termination of parental rights based upon a finding that "[t]he parent has . . . neglected the juvenile" within the meaning of N.C.G.S. § 7B-101(15). *Id.* A neglected juvenile, in turn, is statutorily defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

Generally, when a termination of parental rights is based upon a determination of neglect, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167 (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d. 425, 430 (2019) (citing *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232).

In the order terminating respondent's parental rights, the trial court made unchallenged findings of fact including, *inter alia*, that Julie had been adjudicated to be a neglected and dependent juvenile in November 2017, that during the adjudication hearing respondent "stood mute," and that respondent had been employed at a furniture company prior to being incarcerated on 19 September 2018 for the sale and delivery of crack cocaine and for having attained the status of an habitual felon. "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citation omitted).

While the aforementioned findings of fact are not disputed by respondent, he nonetheless challenges other specific findings of fact which are pertinent to the neglect basis for termination of parental rights. Firstly, we address his contention that the portion of Finding of Fact 14 that states that Julie's mother did not have placement options for Julie at the time that the juvenile petition was filed was not supported by the evidence. Respondent asserts that he consistently sought custody of Julie and that at the time of Julie's removal from the mother's home, respondent "had gainful employment, suitable housing, and no known parenting deficiencies." Respondent claims, however, that DSS did not consider him for placement. We are not persuaded by this contention. In its prior adjudication order, the trial court found as a fact that when the juvenile petition and the amended juvenile petition were filed, Julie's mother lacked an appropriate alternative childcare arrangement. Respondent

did not appeal from the trial court's adjudication order, and therefore he is bound by the doctrine of collateral estoppel from relitigating the challenged portion of Finding of Fact 14. *In re T.N.H.*, 372 N.C. at 409, 831 S.E.2d at 60 (citing *King v. Grindstaff*, 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973)) (stating that because the challenged findings of fact concerned facts that were stipulated to by the respondent-mother when the juvenile was adjudicated neglected, and the respondent-mother did not appeal from the adjudication order, she was bound by the doctrine of collateral estoppel from relitigating the findings of fact).

Respondent next challenges the portion of Finding of Fact 26 that describes his case plan as requiring him to "complete a Comprehensive Clinical Assessment (CCA) with RHA Behavioral Health, to *address* mental health, substance abuse, and domestic violence issues and comply with any and all recommendations." (Emphasis added). Respondent contends that this finding, as worded, suggests that he had mental health, substance abuse, and domestic violence issues that needed to be addressed by his case plan. Respondent asserts that this implication is not supported by the evidence. In support of this contention, respondent cites the testimony of the foster care social worker who described the purpose of the CCA as being "to see *if* there were any mental health concerns, substance abuse concerns, [or] domestic violence concerns." (Emphasis added). Respondent's argument lacks support. Initially, we note that the disposition order entered on 29 November 2017 similarly stated that respondent was required to follow a case plan that included completing a

CCA addressing "mental health, substance abuse, and domestic violence issues." Respondent is barred once again by the doctrine of collateral estoppel from relitigating this issue. *Id.* Secondly, in light of respondent's extensive criminal history, which included domestic violence, substance abuse, and pending drug-related charges, it was not unreasonable for the trial court to impose the requirements of his case plan, nor was it erroneous for the trial court to describe the case plan as addressing these issues in the event that the CCA showed that such issues were present.

Respondent next argues that Finding of Fact 27 is erroneous for several reasons. This finding states the following:

> 27. [Respondent] completed a CCA with RHA on February 26, 2018. At the time of the Assessment, Respondent father [ ] denied any substance abuse issues. He completed a hair follicle drug screen on February 21, 2018, which was positive for Oxycodone and Hydrocodone. [DSS] requested that Respondent father [ ] follow up with RHA in order to have a re-assessment. Respondent father [ ] refused to go back to RHA or engage in any substance abuse treatment due to his work schedule.

First, respondent contends that there was insufficient competent evidence that he tested positive for hydrocodone and oxycodone. Respondent argues that although the foster care social worker testified that she told respondent of his positive drug screen, she never actually testified that his hair sample on 21 February 2018 contained hydrocodone and oxycodone. Respondent further contends that DSS failed to lay a foundation for the social worker's knowledge of the results of the drug screen. Once

again, we are not persuaded. The trial court took judicial notice of all prior orders in the court file, and the trial court's finding of fact at issue is supported by a permanency planning order entered on 14 June 2018 which found as a fact that respondent tested positive for hydrocodone and oxycodone. Although the permanency planning order is subject to a lower standard of evidentiary proof than a termination of parental rights determination, this Court has acknowledged that "[a] trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." *In re T.N.H.*, 372 N.C. at 410, 831 S.E.2d at 60 (citing *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981)).

Respondent also challenges the portion of Finding of Fact 27 that states that he "refused to go back to RHA or engage in any substance abuse treatment due to his work schedule." Respondent contends that there was no evidence that he was ever advised to engage in substance abuse treatment, nor was there clear, cogent, and convincing evidence that he had a substance abuse problem. Respondent additionally argues that there was insufficient evidence to support a finding that he refused to go back to RHA due to his work schedule. Respondent claims that he was given one opportunity to return to RHA, and on that particular day, he admits telling the social worker that he could not go to RHA due to work obligations. Respondent submits that

DSS never attempted to accommodate his work schedule and never consulted with him before arranging appointments for him. Respondent reasons that "[a] refusal to do something on one day is not a refusal *ever* to do it." We find that some of the elements contained in Finding of Fact 27 are supported by clear, cogent, and convincing evidence, although a portion of this finding was not sufficiently proven.

Based on respondent's positive drug screen for hydrocodone and oxycodone, coupled with his pending drug-related criminal charges at the time, the trial court could reasonably infer that respondent had a substance abuse problem. *See In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167–68 (2016) (stating that it is the trial court's duty to consider all of the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom); *see also Scott v. Scott,* 157 N.C. App. 382, 388, 579 S.E.2d 431, 435 (2003) (stating that when the trial court sits as fact-finder, it is the sole judge of the credibility and weight to be given to the evidence, and it is not the role of the appellate courts to substitute their judgment for that of the trial courts). Regarding respondent's refusal to go to RHA, the social worker testified that she called respondent following his positive drug screen and asked respondent to go to RHA to complete another assessment. The social worker stated that respondent told her that "[h]e was not going back to RHA to take drug classes because that would make him look bad." Based on this testimony, the trial court could reasonably infer that respondent refused to go back to RHA. We conclude, however, that the evidence does not support the specific portion of the finding of fact

that states that respondent refused to return to RHA due to his work schedule. Thus, we disregard this particular portion of Finding of Fact 27.

Respondent next challenges the portions of Finding of Fact 28 that state that respondent "specifically refused" to submit to drug screens on 29 March 2018 and 27 June 2018. As to the 29 March 2018 drug screen, respondent represents that he was asked to "drop everything on a moment's notice, including leaving food in the oven, to get in a car operated by DSS employees, and be driven directly to a lab where he would receive [the] drug test." Respondent argues that this request by DSS was unreasonable, while his unwillingness to comply with the request was not unreasonable. As to the 27 June 2018 drug screen, the social worker testified that when asked to submit to the drug screen on said date, respondent told the social worker that he would not be able to pass the drug screen. Respondent opines that the trial court's finding of fact based on this testimony, that respondent refused to submit to the drug screen that had been arranged, "suggests a desire to hide the truth," which he claims is misleading. We are not persuaded.

At the termination hearing, when asked whether DSS was able to screen respondent for the presence of controlled substances, the social worker testified that DSS was not able to do so because respondent "refused." As to the 29 March 2018 drug screen, the social worker testified that respondent stated "[h]e was just waking up and he was cooking." As to the 27 June 2018 drug screen, the social worker testified that respondent "said he would not be able to pass so he wasn't going to go."

The social worker's testimony regarding respondent's reactions to these respective drug screen administrations clearly supports the trial court's finding that respondent "refused" to go with DSS for a drug screen on each of the two occasions. Although respondent contends that the circumstances of the drug screens should have led to a different finding, it was for the trial court to determine the reasonable inferences to be made from the social worker's testimony. *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68; *Scott v. Scott,* 157 N.C. App. at 388, 579 S.E.2d at 435.

Respondent further challenges the portion of Finding of Fact 28 that states that DSS had made eleven unsuccessful attempted drug screens. Respondent argues that there was insufficient evidence in the record to support the trial court's finding of fact. Respondent's rationale for his position is the layered argument that because there was no evidence of any actual contact between DSS and respondent concerning the nine drug screens other than the ones attempted on 29 March 2018 and 27 June 2018, and because there was no evidence that respondent was made aware of DSS's attempt to screen him for drugs on these dates, then the trial court had no basis to find that he refused those attempted drug screens. DSS concedes that the evidence presented on this matter only demonstrates that respondent was unavailable to be tested. Thus, we disregard this portion of Finding of Fact 28.

Respondent next challenges the portion of Finding of Fact 31 that states that he failed to approach his employer to request a modification of his work schedule so that respondent could visit with Julie. We note that respondent conceded during

cross-examination at the termination hearing that he never went to his superior to ask for such a modification. Respondent's own testimony therefore directly supports this finding of fact.

Respondent further argues that there is no evidence to support the segment of Finding of Fact 31 that states that the trial court would have been inclined to grant weekend visitation with Julie to respondent in order to accommodate his work schedule. We disagree. We agree with the Court of Appeals that "[i]t is well-established that a trial court may take judicial notice of its own proceedings." *In re J.C.M.J.C.*, 834 S.E.2d 670, 676 (N.C. Ct. App. 2019). Here, the same assigned trial judge presided over this case's proceedings from the time of the adjudication hearing through the termination hearing. As a result, the assigned trial judge had actual knowledge, in his capacity as the trial court, of his own inclinations and therefore could take judicial notice regarding whether the trial court would have granted weekend visitation to respondent. Consequently, we overrule respondent's challenge to this finding of fact.

Respondent argues that Finding of Fact 32 is not supported by the evidence. That finding of fact states the following:

> 32. Respondent father [ ] has willfully failed and refused to correct any of the conditions which led [Julie] to come into the care of [DSS]. These conditions still exist as of this hearing. Respondent father [ ] has not attended a parenting class nor has he sought and/or obtained any domestic violence treatment and/or counseling. In addition, the conditions which led [Julie] to come into the care of

> [DSS] will in all likelihood continue to exist in the reasonably foreseeable future such that [Julie] will be unable to safely come into the care of Respondent father [ ].

Respondent contends that nearly all of the allegations relating to Julie's removal from the home concerned Julie's mother. He asserts that no evidence indicated that he "willfully failed and refused" to correct substance abuse and mental health problems of Julie's mother, and further asserts that his case plan never required domestic violence counseling or treatment. We are not persuaded. While it may be true that respondent had no role in the mother's substance abuse and mental health issues, Julie's placement in foster care after her removal from the mother's home was predicated on the fact that she could not be placed with respondent. As stated previously herein, to address the issues which prevented Julie's placement with respondent, the trial court first ordered that respondent must engage in a case plan which included domestic violence, mental health, and substance abuse components and comply with all recommendations. Second, in the order ceasing reunification efforts, the trial court found as a fact that respondent "informed the social worker on October 17, 2017, that he was waiting until he goes to court for pending drug charges before he begins services identified on his case plan." Third, as indicated earlier, respondent tested positive for hydrocodone and oxycodone and refused to complete two drug screens. Consequently, we conclude that the evidence in the record supports this finding of fact.

Respondent next challenges the portions of Findings of Fact 34 and 35 that state that his only requirement before resuming visits with Julie was the attainment of negative drug screens. Respondent claims that this determination is inaccurate, because the dispositional order suspended his visits until respondent began to participate in the activities of his case plan. Respondent contends that DSS never referred him to parenting classes, therefore he was unable to complete that part of his case plan. Respondent goes on to conclude that there was never a time that he had the ability to participate in all of the activities of his case plan and to therefore gain visitation privileges. We agree in part and disagree in part with respondent's position on these two findings of fact.

The disposition order entered on 29 November 2017 states that respondent could engage in visitation with Julie upon his completion of "one drug screening that is negative for all illegal and/or non-prescribed controlled substances, *and* [*upon*] *begin*[*ning*] *participating in the activities of his case plan*." (Emphasis added.). Thus, the portion of Finding of Fact 34 that states that the *only* requirement for respondent to visit with Julie prior to 30 May 2018 was the attainment of a negative drug screen is incorrect.

Finding of Fact 35 states that the only requirement for respondent to visit with Julie from 30 May 2018 until his incarceration was the completion of two negative drug screens. This finding is supported by the record. The permanency planning order entered on 14 June 2018 expressly shows that respondent's completion of two

negative drug screens was the sole prerequisite to visitation and that respondent's visitation was not conditioned upon respondent participating in the activities of his case plan. Regardless of whether respondent was required to engage in the activities of his case plan prior to being allowed to visit with Julie, the record is clear that respondent never completed any negative drug screens, and therefore never satisfied this condition precedent to visitation. Thus, DSS's purported failure to refer respondent to parenting classes had no effect on his ability to visit with Julie.

Respondent further argues that even if he had complied with the trial court's prerequisites to visitation, Julie was living in Anson County and New Hanover County prior to the termination hearing and the distance from his residential county of Caldwell County to where Julie was located made visitation less feasible. It is worthy to note, however, that respondent testified at the termination hearing that he did not learn of Julie's whereabouts until the termination hearing. Because respondent was unaware of Julie's residential placements and her geographical distance from respondent, these issues could not have had a dampening effect on respondent's desire to visit with Julie or on his ability to see her.

In Findings of Fact 34 and 35, the trial court again found that respondent had refused to complete drug screens on 29 March 2018 and 27 June 2018. The trial court also found that respondent was "not at home during other times when [DSS] attempted to drug screen him." We have already determined that the trial court could reasonably infer, based on competent evidence adduced at the termination hearing,

that respondent refused to submit to the drug screens. The trial court additionally found as a fact that respondent was "not at home" during additional attempts by DSS to obtain a drug screen from him. As observed earlier in our analysis, DSS concedes that the evidence demonstrates respondent's unavailability to be tested for the presence of controlled substances. Ultimately, we conclude that these portions of Findings of Fact 34 and 35 properly reflect the evidence in the record.

Respondent next argues that the portions of Finding of Fact 36 that state that he had no contact with Julie and failed to send her cards or gifts were not supported by the record. Respondent asserts that the record contains no evidence that he had the ability to write to Julie or to send her cards or gifts after his incarceration. Respondent also contends that there was no evidence that Julie's foster parents would allow him to contact her or send her cards or gifts. We note that the trial court did not make any finding of fact regarding whether respondent did or did not have the ability to contact Julie or to send her cards or gifts; the trial court's finding of fact merely states that respondent did not do so. This finding is supported by the social worker's testimony that following respondent's incarceration, respondent never sent Julie any cards or gifts and never asked DSS to forward any letters to the child. The social worker further testified that respondent's last visit with Julie occurred on 1 September 2017. Respondent's argument does not relate to the sufficiency of the evidence to support this finding of fact, but instead relates to the legal conclusion of his neglect and willful abandonment of Julie. *See In re N.D.A.*, 373 N.C. 71, 82, 833

S.E.2d 768, 776 (2019) ("[T]he trial court failed to make any findings of fact regarding whether respondent-father had the ability to contact [DSS] and [his daughter] while he was incarcerated, with such findings being necessary in order for the trial court to make a valid determination regarding the extent to which respondent-father's failure to contact [his daughter] and [DSS] . . . was willful."). Finding of Fact 36 reflects the social worker's testimony, and we thus conclude it is supported by clear, cogent, and convincing evidence.

Respondent also challenges Findings of Fact 7 and 33. Finding of Fact 7 concerns respondent's last known address; Finding of Fact 33 relates to the ground of willful abandonment. However, because we conclude these findings were not necessary to support the trial court's conclusion that grounds existed to terminate respondent's parental rights for neglect, we refrain from engaging in an unnecessary review of respondent's challenges to those two findings of fact. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59 (citing *In re Moore*, 306 N.C. at 404, 293 S.E.2d at 133).

Respondent next argues that the trial court's findings of fact do not support its conclusion that grounds existed to terminate his parental rights due to neglect. Respondent represents that he had no role in Julie's removal from the mother's home. Respondent contends that there was no evidence that he lacked parenting skills or that he suffered from any condition arising from mental health, substance abuse, or domestic violence concerns that could harm Julie or place her at a substantial risk of harm. Thus, respondent asserts that his failure to complete his case plan does not

affect his fitness to parent Julie and consequently is not relevant to the conclusion of neglect. Respondent further contends that the findings of fact do not support a conclusion of neglect by abandonment because no evidence was presented and no findings of fact were made regarding his ability to remain in contact and communication with Julie while he was incarcerated. We disagree with respondent's position.

First, we do not accept respondent's contention that the trial court's conclusion of neglect was erroneous because he was not responsible for the conditions that resulted in Julie's placement in DSS custody. This Court has explained that "[i]n determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent." *In re M.A.W.*, 370 N.C. at 154, 804 S.E.2d at 517 (quoting *In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 252). In *In re M.A.W.*, this Court held that a prior adjudication of neglect based on a mother's substance abuse and mental health issues was "appropriately considered" by the trial court as "relevant evidence" in proceedings to terminate the parental rights of a father who was incarcerated at the time of the prior adjudication. *Id.* at 153, 804 S.E.2d at 517; *see also In re C.L.S.*, 245 N.C. App. 75, 78–79, 781 S.E.2d 680, 682–83 (affirming termination of a father's parental rights on the ground of neglect where the father was incarcerated and paternity was not established until after a prior adjudication of neglect based on the mother's substance abuse), *aff'd per curiam*, 369 N.C. 58, 791 S.E.2d 457 (2016). It is

therefore not necessary that the parent whose rights are subject to termination be responsible for the prior adjudication of neglect.

Furthermore, we do not agree with respondent's claim that he played no part in the prior adjudication of neglect. As we stated previously, although respondent may have had no role in the mother's substance abuse and mental health issues, Julie's removal from the mother's home and resulting placement in foster care were also largely due to the fact that the juvenile could not be placed with respondent. To address the issues which prevented Julie's placement with respondent, the trial court ordered respondent to engage in a case plan which included domestic violence, mental health, and substance abuse components and to comply with all recommendations. Respondent failed to comply with the requirements of the order.

Second, we are not persuaded by respondent's claim that there was no evidence that he had the ability to remain in contact and communication with Julie while he was incarcerated but chose not to do so, to the extent that his incarceration contributed to his lack of interaction with the child. This Court has stated:

> A parent's incarceration may be relevant to the determination of whether parental rights should be terminated, but "[o]ur precedents are quite clear—and remain in full force—that '[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision.' " Thus, respondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect. Instead, the extent to which a parent's incarceration . . . support[s] a finding of neglect depends upon an analysis of the relevant facts and circumstances, including the length of the parent's incarceration.

*In re K.N.*, 373 N.C. 274, 282–83, 837 S.E.2d 861, 867–68 (2020) (citations omitted). In the present case, similar to the circumstances in *In re K.N.*, the trial court failed to conduct such an analysis. However, pertinent aspects of respondent's incarceration here distinguish this case from *In re K.N.* In *In re K.N.*, the father was already incarcerated at the time that he entered into his case plan. *Id.* at 276, 837 S.E.2d at 864. Respondent here, on the other hand, was not incarcerated until 19 September 2018, almost twelve months after he entered into his case plan and more than twelve months since he last visited Julie.

The trial court's findings in this case reveal circumstances similar to those in *In re M.A.W.* In *In re M.A.W.*, this Court found that "the evidence of [the father's] prior neglect does not stand alone," noting the father's long history of criminal activity and substance abuse and his stipulation to the allegations of neglect that led to the juvenile's adjudication as a neglected juvenile. 370 N.C. at 154, 804 S.E.2d at 517. The father in *In re M.A.W.* also admitted to being aware of the mother's substance abuse issues. *Id.* Similarly, in the instant case, respondent has an extensive criminal history, with many of his past offenses involving controlled substances. The trial court also found, as previously mentioned, that respondent "stood mute" when the allegations in the amended juvenile petition were presented. Furthermore, the amended juvenile petition contains an allegation that respondent was aware of the mother's ongoing substance abuse and took no action to ensure Julie's safety.

Additional facts supporting the trial court's conclusion that there was a likelihood of repetition of neglect included its finding of fact that respondent had last visited with Julie in September 2017 and took no action to be a part of Julie's life. Thus, respondent had not developed a relationship with Julie and had not demonstrated an ability to care for her. Furthermore, prior to his incarceration, respondent made no attempt to comply with his case plan or to address the barriers to reunification that had been identified by the trial court. Respondent tested positive for hydrocodone and oxycodone, refused two drug screens, and failed to go to RHA. We therefore conclude that "[t]he trial court properly found that past neglect was established by DSS and that there was a likelihood of repetition of neglect[,]" *id.* at 156, 804 S.E.2d at 518, because the trial court's findings of fact demonstrate that respondent's circumstances had not changed so as to render him fit to care for Julie at the time of the termination hearing. *See In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232 (explaining that the trial court must consider evidence of changed circumstances since the adjudication of past neglect, and that the determinative factors are the best interests of the child and the fitness of the parent to care for the child at the time of the termination hearing). Thus, we hold that the trial court did not err in adjudicating neglect as a ground to terminate respondent's parental rights to Julie pursuant to N.C.G.S. § 7B-1111(a)(1).

The trial court's conclusion that a ground for termination existed pursuant to N.C.G.S. § 7B-1111(a)(1) is sufficient in and of itself to support the termination of

respondent's parental rights. *In re T.N.H.*, 372 N.C. at 413, 831 S.E.2d at 62. Furthermore, respondent does not challenge the trial court's conclusion that termination of his parental rights was in Julie's best interests. *See* N.C.G.S. § 7B-1110(a). Accordingly, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.