An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-639

Filed 1 April 2026

McDowell County, Nos. 23JT 000010-580, 23JT000011-580, 23JT000012-580

IN RE: J.S., J.S., J.S.

Appeal by Respondent-Mother from order entered 21 April 2025 by Judge Ellen M. Shelly in McDowell County District Court. Heard in the Court of Appeals 10 March 2026.

*Mercedes O. Chut, for the respondent-appellant-mother.*

*Aaron G. Walker, for the petitioner-appellee- McDowell County Department of Social Services.*

*Brittany T. McKinney, for guardian ad litem.*

TYSON, Judge.

Respondent-Mother appeals from the trial court's order terminating her parental rights to her three minor children. We affirm.

## I.    Background

Respondent-Mother has three minor children: a nine-year-old male J.S. ("Joseph"), an eight-year-old female J.S. ("Jane"), and a six-year-old male J.S. ("Jack"). *See* N.C. R. App. P. 42(b) (pseudonym used to protect the minors' identities).

On 6 February 2023, all three children were taken from their Mother and removed into the nonsecure custody of McDowell County Department of Social Services ("DSS") following allegations of inadequate supervision, substance abuse, and her failure to ensure Jane had received proper medical care for her diagnosis of Cystic Fibrosis.

On 26 July 2023, the trial court adjudicated the juveniles as neglected. The court found the children had told a social worker they had "constantly hit on one another." The parents, who are married and were living together, admitted to using illegal drugs: THC, methamphetamine, and crack cocaine. The family's home was in poor condition, with an excessive amount of animals and dog feces indoors, electrical safety issues, water damage, no primary heat, holes in the walls resulting from domestic violence between Respondent-Mother and father, and Respondent-Mother's sister and maternal grandmother. Additionally, roaches were found inside of Jane's nebulizer.

On 3 April 2023, Respondent-Mother entered into a case plan with DSS, in which she was required to: (1) complete a comprehensive clinical assessment ("CCA") and a parental capacity evaluation ("PCE") and to follow all recommendations; (2) complete parenting classes for medically fragile children and demonstrate skills learned; (3) cooperate with random drug screens and refrain from using illegal drugs; (4) maintain appropriate housing, employment or income, and transportation; and, (5) visit the children and "remain appropriate."

Between July and August 2023, Respondent-Mother participated in four interviews and sessions with Dr. Gordon G. Cappelletty, a psychiatrist, for a PCE. Dr. Cappelletty found Respondent-Mother exhibited an IQ of 74 and suffers from a type of schizophrenia, which responds poorly to medication, and which developed partially due to her methamphetamine use. In addition, Dr. Cappelletty opined Respondent-Mother's "orientation was questionable . . . [s]he could not recall the day, date, or year correctly," she "couldn't comprehend communication even at a very basic level," and she does not even know how old she is.

Dr. Cappelletty concluded: "She evidently lacks a basic understanding of the role of a parent in caring for children;" "[Respondent-Mother's] children would clearly not be safe with her . . . because she would not know how to intervene in a timely manner when a potentially dangerous situation arises;" and, "she is unlikely to be able to effectively parent her children without substantial support." Dr. Cappelletty ended his report, concluding: "[T]here is a heightened possibility of severe emotional and physical neglect should [Respondent-Mother] be given custody of her children."

All three adjudicated juveniles attended therapy sessions. During therapy, all made allegations of sexual abuse, which purportedly occurred while they were in Respondent-Mother's home.

By the 12 October 2023 permanency planning hearing, Respondent-Mother had made substantial progress on her case plan. She had completed her CCA at RHA Health Services ("RHA"), attended parenting classes, passed both random drug

screens requested, obtained employment at an assisted living facility, repaired holes in the house's walls, and visited consistently with the children. Based on these findings, the trial court ordered a primary plan of reunification with a secondary plan of guardianship.

On 11 January 2024, a second permanency planning hearing was held. The court found all three children, during their therapy sessions, had made allegations of sexual abuse while in the parents' home. Based upon the sexual abuse allegations, the court suspended visitation with Respondent-Mother. The trial court adopted a primary plan of guardianship with a secondary plan of adoption. The maternal grandparents were willing to assume guardianship over the children.

On 11 April 2024, a third permanency planning hearing was held, and the court ordered Respondent-Mother to complete medication management and mental health treatment as part of her case plan. On 11 July 2024, a fourth permanency planning hearing was held, and the trial court found Respondent-Mother had not participated in medication management or in mental health treatment. Respondent-Mother testified she did not understand her mental health diagnoses, and she disagreed with the PCE findings. The trial court ordered DSS to schedule an appointment with RHA "to see if they can provide the treatment that is recommended by the mother's [PCE]."

On 12 September 2024, a fifth permanency planning hearing was held. The trial court found Respondent-Mother had presented to RHA on 30 July 2024, but she had declined to do a psychological evaluation or engage in treatment.

On 14 January 2025, DSS filed a motion to terminate Respondent-Mother's parental rights based upon grounds of neglect, willful failure to make reasonable progress to correct conditions, which had led to the children's removal, willful failure to pay a reasonable portion of the cost of care, and dependency.

The termination of parental rights hearing was held on 9 April 2025. Prior to the hearing, the court admitted into evidence, without objection, the PCE report and Dr. Cappelletty's *curriculum vitae*. Social Worker Wood and Respondent-Mother both provided live testimony.

Social Worker Wood testified Respondent-Mother does not believe she needs any treatment, she denies anything had happened to the children, and "she doesn't even know why DSS is involved." Social Worker Wood also testified Respondent-Mother had not demonstrated an understanding or ability to provide the medical care required for Jane's Cystic Fibrosis treatment. Respondent-Mother had refused to sign off on Jane's doctor's request to take out one of Jane's ports, and she also refused to change one of the boy's ADHD medications.

Respondent-Mother testified she did not remember going to RHA or refusing offers to start medication. She was unaware of the issues that resulted in DSS removing the juveniles. She testified the "only issue" DSS was concerned about was

the dog hair in the home before the children were removed, and it was her understanding there were no other issues.

The trial court entered an order terminating Respondent-Mother's parental rights to the juveniles. The trial court found:

> Throughout the history of this case[,] the respondent mother has refused to acknowledge any responsibility for the children being placed out of her home and being adjudicated to be neglected . . . . The respondent mother has attempted to comply with portions of her case plan, except for medication management, but has not shown benefit from any classes and courses taken.

The trial court terminated parental rights based upon neglect, willful failure to make reasonable progress, and dependency. Respondent-Mother appeals.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a)(7) (2025).

## III. Issues

Respondent-Mother argues the trial court erred by terminating her parental rights under N.C. Gen Stat. §§ 7B-1111(a)(1), (2), and (6) because the trial court allegedly based its decision solely upon Respondent-Mother's PCE results. N.C. Gen Stat. §§ 7B-1111(a)(1), (2), (6) (2025).

## IV. Standard of Review

This Court reviews an adjudication order "to determine whether the findings are supported by clear, cogent and convincing evidence and [whether] the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984) (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). Termination of parental rights based upon "must [include] a showing of . . . a likelihood of future neglect by the parent." *In re Ballard*, 311 N.C. 708, 713-15, 319 S.E.2d 227, 231-32 (1984). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (citation omitted).

## V. Neglect

A trial court may terminate parental rights for neglect if the juvenile is neglected within the meaning of N.C. Gen. Stat. § 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1) (2025). A neglected juvenile is defined as one "whose parent . . . does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (2025).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of . . . a likelihood of future neglect by the parent.

*In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. at 713-15, 319 S.E.2d at 231-32.)

Respondent-Mother argues the trial court erred by concluding there is a likelihood of future neglect based solely upon her mental health diagnosis. *Id.*, *See In re A.L.L.*, 376 N.C. 99, 112, 852 S.E.2d 1, 10-11 (2020) (finding a parent's mental health condition or diagnosis cannot alone establish any ground to terminate parental rights). Our review of the whole record shows Respondent-Mother's mental health condition was not the sole reason for termination.

This Court has stated a "case plan is not just a checklist" and a parent is required to "demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors." *In re Y.Y.E.T.*, 205 N.C. App. 120, 131, 695 S.E.2d 517, 524 (2010).

A case plan which mandates a parent to undergo and successfully complete required courses and treatments must be examined to determine whether the case plan requirements demonstrate efficacy and will help alleviate the reasons the children were removed from their parents to facilitate the statutory plan of reunification. *See In re B.O.A.*, 372 N.C. 372, 381, 831 S.E.2d 305, 312 (2019) ("[N.C. Gen. Stat.] § 7B-904(d1)(3) authorizes the trial judge, as he or she gains a better understanding of the relevant family dynamic, to modify and update a parent's case plan in subsequent review proceedings conducted pursuant to [N.C. Gen. Stat.] § 7B-906.1.").

This Court has determined a parent's failure to acknowledge or accept responsibility for their child's removal and a lack of understanding of the parent's

role in the removal, may be sufficient to support the trial court's conclusion a probability of future neglect exists. *In re B.A.J.*, 295 N.C. App. 593, 607, 907 S.E.2d 52, 62-63 (2024); *In re J.M.V.,* 296 N.C. App. 374, 389, 909 S.E.2d 347, 358 (2024).

Evidence presented at the hearing shows Respondent-Mother had not demonstrated changed behaviors after attending mandatory parenting classes. The social worker testified:

> A: I know that she did attend some parenting classes. I received a certificate of completion. However, while she completed them she did not benefit from them.
>
> Q: And in what way did she not benefit, like what did you observe that showed that she had not benefited from those classes?
>
> A: Well, I've not observed any interaction between her and her children, but it's like [Jane's doctor] wanted to remove the port [from Jane], and she wouldn't approve of that. And when Jason needed his medication changed and she didn't want that to happen. You know, these are doctors that are telling her that this is going to benefit her children's health, and if she's not, you know, willing to do that, I mean, that shows to me a lack of understanding what the needs of her children are.

As in *B.A.J.* and *J.M.V.*, Respondent-Mother denied understanding or responsibility for her role in the juveniles' removal from her home. Respondent-Mother's testimony tended to show she did not understand why DSS had taken and removed her children. When asked what issues led to her children being removed by DSS, Respondent-Mother testified there were issues with the dogs in the house and the dog hair.

When asked to clarify whether the dogs and animals inside the home and dog hair were the only issues that led DSS to remove the children, Respondent-Mother stated:

> A: Yeah, just dog hair.
>
> Q: That was the only issue?
>
> A: Yeah.
>
> Q: To your understanding, there wasn't [sic] any other issues?
>
> A: No.

The social worker further testified:

> I have concerns. I think the biggest thing is, is that she does not believe that any of the abuse or neglect has happened. She denies that anything has happened to her children. Further, we have had meetings where she has stated that she doesn't even know why DSS is involved because she doesn't believe that anything has happened.

The evidence and record clearly shows issues other than the "dog hair" existed. For example, before the juveniles were removed from the home, "roaches were falling out of [Jane's] nebulizer," there was no main heating in the home, and dog feces was present on the floor. The social worker testified the condition of the home at the time of the termination hearing was similar to its condition at the time of the children's removal, and Respondent-Mother did not understand what was "needed to be done to make it a safe home for the children." The trial court found and concluded

Respondent-Mother "has refused to acknowledge any responsibility for the children being placed out of her home and being adjudicated to be neglected."

The trial court's findings of fact support its conclusion Respondent-Mother had neglected the children and there was a significant risk of a recurrence of neglect should they be restored to her care. The trial court did not err in determining grounds existed to terminate Respondent-Mother's parental rights based upon neglect pursuant to N.C. Gen. Stat. § 7B-1111(a)(1).

"Because only one ground is needed to support a trial court's order terminating parental rights, it is unnecessary to address Respondent-[M]other's arguments regarding the other two grounds of willful failure to make reasonable progress and dependency." *In re J.M.V.,* 296 N.C. App. at 389, 909 S.E.2d at 358 (citing *In re C.K.I.,* 379 N.C. 207, 210, 864 S.E.2d 323, 326 (2021)).

## VI.    Conclusion

The trial court's adjudicatory findings of fact are supported by clear, cogent, and convincing evidence. This evidence and findings support the trial court's conclusion to terminate Respondent-Mother's parental rights. The order appealed from is affirmed. *It is so ordered.*

AFFIRMED.

Judges CARPENTER and FLOOD concur.

Report per Rule 30(e).